## Richmond

JAMES HORACE REID V. COMMONWEALTH OF VIRGINIA.

April 23, 1973.

Record No. 8115.

Present, All the Justices.

*W. Scott Street, III (Wood & Street,* on brief), for plaintiff in error.

*Linwood T. Wells, Jr., Assistant Attorney General (Andrew P. Miller, Attorney General,* on brief), for defendant in error.

HARRISON, J., delivered the opinion of the court.

James Horace Reid was convicted by a jury of first-degree murder and sentenced by the trial court to serve 75 years in the penitentiary. It is contended that questions and comments by the Commonwealth's Attorney at the trial relative to Reid's failure to make certain assertions while in custody, which he later advanced at his trial, violated his constitutionally protected right to remain silent.

Reid was arrested in the Massad House Hotel in Richmond on October 30, 1971 and charged with the murder of William E. Padgette. Thomas Orth, the hotel's night clerk, testified that about 2:50 A. M. on October 30th Reid entered the hotel lobby and asked to see Padgette. Reid talked to Padgette on a lobby phone and then went up to Padgette's room. A few minutes later Orth, while making a routine hourly check of the hotel, heard a disturbance in Padgette's

room. He knocked on the door and, upon receiving no response, called out that he was going downstairs to call the police. Thereupon Reid opened the door, knocked Orth back and cut him on the wrist and elbow with a knife. Orth could see Padgette sitting in a chair gasping for breath. Reid held Orth at knife point while he rummaged through the drawers in a bureau and a desk in Padgette's room. Then Reid marched Orth down to the hotel lobby, where he cut the telephone line and pulled a Burns camera detection apparatus off the wall. Unknown to Reid, Orth triggered an alarm in the Richmond police station by removing a $5 bill from the hotel cash register. Within 1-2 minutes the police arrived. A chase ensued through and around the hotel and an adjoining building before Reid was apprehended in the hotel. At one time during the chase Reid leaped from a second-floor window to a concrete sidewalk.

The officers found Padgette's body upright in a chair in his room, clothed only in his pajama bottoms. Resting in his left hand and between his legs was a 4-foot cane or stick. He had been stabbed three times in the left chest, twice in the right chest, once in the mid-upper back and had bled profusely. The medical examiner testified that Padgette died as the result of a stab wound of the chest which penetrated the heart. He was dead at the time of the doctor's examination at 4:17 A. M. Padgette was 65 years old at the time of his death and suffered from gout and high blood pressure—he used a cane to assist him in walking. He had been residing in the hotel since August 18, 1971.

At Reid's trial the following exchange occurred during the direct examination of one of the investigating officers, Detective Harry W. Duke:

"Q. Detective Duke, at first when you saw Mr. Reid, did he complain to you?
"A. At that time? No, sir, he did not.
"Q. Complain of any injury, I'm talking about?
"A. No, sir, not at that time.
"Q. When you say 'Not at that time,' did he ever complain to you about any injury?"

To the last question Duke responded that Reid never complained to him; that he talked to Reid the morning of the murder and advised him of his constitutional rights; that Reid said he understood his rights

and did not care to make a statement other than to request the detective to go by the Eggleston Hotel and pick up his clothes. Two days later, when Reid was brought up to receive the clothes, Duke noticed that he was limping and asked why. Reid said only that he had hurt his foot. Duke had Reid sent to the hospital to have the foot examined.

The Commonwealth called as witnesses six other police officers who had investigated the murder, seen the decedent's body, observed the scene and participated in the chase resulting in apprehension of the defendant.

Reid was the only witness for the defense. He testified that he was 31 years old and admitted to previous convictions of a felony and a misdemeanor involving moral turpitude. Reid had lived at the Massad Hotel from September 28 to October 21, 1971. He said that during that time he and Padgette became good friends, "socialized together" and "used to do a little Indian wrestling".

On the night of the murder he had been to a night club and decided that he would "go down . . . and see Padge and see what he's gonna do". Reid's account of the visit was that after they talked awhile Padgette said to him "Lemme see how good you are at this Indian wrestling"; that Padgette was on the bed and when he tried to brace himself to wrestle, Reid inadvertently hit him in the nose causing it to bleed; and that Padgette started cursing and went to the bathroom, returning within a few minutes still cursing and exclaiming that he was going to kill Reid. He said that Padgette came at him swinging "a club or something" and hit him in the ribs and on the legs five times, although aiming for his head; Reid became scared, pulled out his knife and started stabbing; after he had stabbed him he helped Padgette to the chair and sat him in it. Reid said he cut his hand fumbling to get his knife out. He also testified that after his alleged altercation with Padgette he was "hurting, in pain" from "wherever he hit me with that stick". When asked, without objection, "Why didn't you tell the police officer you were hurt?" he responded: "Because they had warned me of my right and I didn't know what I might tell them and how they might interpret it. So I didn't say anything to the police officers." It was suggested to Reid that he got hurt when he jumped off the building, to which he replied: "No, sir, I did not get hurt falling off the building. . . . I got hurt—see, when he hit me in the ribs he also hit me on the leg down here."

Subsequently, and again on cross-examination, Reid was asked: "Did you tell Detective Duke or anybody about this self-defense of

Mr. Padgette hitting you with that stick?" He said no. At this point counsel for the defense objected and moved for a mistrial on the ground that Reid was under no duty to tell Mr. Duke anything and that any comment thereon was "unlawful comment on the man's insistence that he stand upon his Constitutional right not to testify against himself". The motion was denied.

During his closing argument the Commonwealth's Attorney made these statements:

> ". . . The only—first time we ever heard anything about self-defense was today. Sure, the defendant has the absolute right to remain silent and his silence will be guarded by the police, which they were. But today when he took that witness stand, under oath, he becomes exactly, exactly the same type witness as all the police officers and everybody else takes. Once he gets on that stand and takes the stand and testifies under oath, we treat him just like anybody else. Today's the first time self-defense has ever been brought up. If it were self-defense then, why couldn't he tell Detective Duke? Why didn't he tell—why did he flee? Why did he run across all these buildings, jumping off the buildings?"

Counsel for the defendant objected and the court instructed the jury as follows:

> "Gentlemen, there has been a discussion at the bench. The Commonwealth's Attorney has—may have made a reference to the defendant as a witness and relating that to his, the defendant's, not making a statement at the time of arrest. He, of course, has a Constitutional right and the Court instructs the jury he has a Constitutional right at the time of arrest to make no statement. There is no duty on him to make a statement; he has a right not to make such a statement. All right, sir."

Counsel for defendant then asked the court to instruct the jury that "they cannot consider that as evidence". The court considered the instruction that it gave the jury to be sufficient and denied a motion for a mistrial.

Reid had an absolute right to remain silent at the time of his arrest. He was under no duty to make any statement to the police. *Escobedo* v. *Illinois*, 378 U. S. 478 (1964). The silence of an accused during

custodial interrogation does not give rise to an inference of guilt and may not be considered a tacit admission of the truth of the charges. *Miranda* v. *Arizona*, 384 U. S. 436 (1966).

It is unnecessary that we review the numerous authorities cited by the Attorney General and counsel for the defendant or consider the conflict between *Raffel* v. *United States*, 271 U. S. 494 (1926) and *Grunewald* v. *United States*, 353 U. S. 391 (1957). This conflict, which caused a marked split of authority as to the admissibility for impeachment purposes of a defendant's silence during custodial interrogation, was resolved by us in *Dean* v. *Commonwealth*, 209 Va. 666, 166 S. E. 2d 228 (1969) when we quoted with approval from the concurring opinion in *Grunewald, supra*, and then said:

> "We interpret cases decided after *Grunewald* as indicating that the Supreme Court has adopted the reasoning of the concurring opinion in *Grunewald*, rather than the reasoning of *Raffel*. E. g. *Spevack* v. *Klein*, 385 U. S. 511, 87 S. Ct. 625, 17 L. ed. 2d 574 (1966); *Griffin* v. *California*, 380 U. S. 609, 85 S. Ct. 1229, 14 L. ed. 2d 106 (1965). We therefore hold that the Fifth Amendment precludes the prosecution from using an assertion of the privilege against self-incrimination to discredit or convict the person who asserted it." 209 Va. at 670, 166 S. E. 2d at 231.

We have no quarrel with this principle of law, relied upon by the defendant, and we do not recede from our holding in *Dean*. But we must decide whether the principle is applicable to the facts before us on this appeal. It was the theory of the Commonwealth, supported by the testimony, that without any provocation Reid committed the brutal murder of Padgette. When the defendant took the witness stand he waived his constitutional right against self-incrimination as to all matters concerning which cross-examination was proper. The defendant claimed that Padgette, armed with a stick, struck him numerous times and that he stabbed Padgette in self-defense. The extent of the injuries sustained by Reid, if any, the part of his body on which the blows were inflicted, and the force that Reid used to repel the alleged attack by Padgette, all became the proper subject of cross-examination. The fact that Reid, although allegedly being attacked by Padgette, did not call or tell the hotel clerk but elected to flee, was a legitimate subject of cross-examination and comment before the jury. The Commonwealth claimed that any injury to Reid's foot hap-

pened when he attempted to escape rather than by a blow from Padgette's cane. Hence the question directed to Duke whether Reid complained of any injury. The Commonwealth reasoned that, in the unlikely event that Padgette was the aggressor, Reid, in the normal course of human events would have welcomed Orth's knock on the door and the possibility of help. Hence the question to Reid on cross-examination, "Did you tell Detective Duke *or anybody* about this self-defense of Mr. Padgette hitting you with that stick?"

It was improper for the Commonwealth's Attorney to have asked Reid if he told Duke about his self-defense, and to have said in argument ". . . if it were self-defense then, why couldn't he tell Detective Duke?" The admonition of the trial judge to the jury could have been clearer. However, we have often observed that there is no such thing as a case perfectly tried. " 'A defendant is entitled to a fair trial but not a perfect one.' " *Bruton* v. *U. S.*, 391 U. S. 123, 135 (1968). In the instant case, in comparison with all the other evidence of guilt, the error ". . . fades into practical and legal insignificance". *Dutton* v. *Evans*, 400 U. S. 74, 93 (1970) (Blackmun, J., concurring).

Reid's claim of self-defense was contradicted by all the other evidence. Padgette was 34 years older than Reid and in ill health. He received multiple stab wounds. The murder was committed only a few minutes after Reid entered Padgette's room, which indicates that Reid was there for some purpose other than socializing or Indian wrestling. Presented with the aid and assistance, in the form of Orth, that Reid claimed he needed, he attacked the hotel clerk. After Orth appeared, Reid ransacked Padgette's room, rendered inoperative the telephone and detection camera in the lobby and made a strenuous effort to escape. Pertinent here is the remark of Justice Blackmun, in remonstrating with his fellow justices in a case presenting similar evidential disparity, that ". . . it is time we become just a little realistic in the face of a record such as this one". *U. S.* v. *Tucker*, 404 U. S. 443, 452 (1972) (dissenting opinion).

We are convinced from a painstaking examination of the record and exhibits that the guilt of the defendant was established, and his claim of self-defense refuted, beyond any reasonable doubt. The jury could have reached no verdict, other than a verdict of guilty, that would have been consistent with the evidence. Considering the enormity of the crime and the brutality with which it was committed, the sentence imposed reflects no prejudice.

In determining whether the error complained of was harmless we

have followed the standard enunciated by the United States Supreme Court in *Chapman* v. *California*, 386 U. S. 18 (1967). There the prosecuting attorney had commented repeatedly and extensively in his closing arguments on the defendant's failure to testify, and the trial judge had thereafter instructed the jury that it could draw adverse inferences from that failure. The court reversed, but in doing so said:

> "We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." 386 U. S. at 22.
>
> \* \* \* \* \*
>
> "We, therefore, do no more than adhere to the meaning of our *Fahy* [*Fahy* v. *State of Connecticut*, 375 U. S. 85] case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. . . ." 386 U. S. at 24.

The doctrine of harmless error has been recently applied in the case of *Schneble* v. *Florida*, 405 U. S. 427 (1972), where the statement of a codefendant who did not testify was admitted into evidence against the defendant in violation of the Sixth Amendment. In finding the error harmless, the court reasoned as follows:

> "[W]e must determine on the basis of 'our own reading of the record and on what seems to us to have been the probable impact . . . on the minds of an average jury,' . . . whether [the codefendant's] admissions were sufficiently prejudicial to petitioner so as to require reversal.
>
> \* \* \* \* \*
>
> "In this case, we conclude that the 'minds of an average jury' would not have found the State's case significantly less persuasive had the testimony as to [the codefendant's] admissions been excluded. . . ." 405 U. S. at 432.

*See also Hall* v. *Commonwealth*, 213 Va. 736, 195 S. E. 2d 882 (1973), this day decided.

The error complained of by the defendant was harmless beyond a reasonable doubt.

*Affirmed.*