Richmond

## LEWIS ARTHUR SCHRUM

v.

## COMMONWEALTH OF VIRGINIA

August 31, 1978.

Record No. 771736.

Present: All the Justices.

*Conrad C. Lawane* for plaintiff in error.

*Robert E. Bradenham, II, Assistant Attorney General (Marshall Coleman, Attorney General, on brief)* for defendant in error.

HARRISON, J., delivered the opinion of the Court.

Lewis Arthur Schrum was convicted by a jury of rape and his punishment was fixed at confinement in the state penitentiary for a period of five years. This appeal questions both the sufficiency of the evidence to convict and the action of the trial court in allowing the admission of testimony dealing with the defendant's exercise of his Fifth Amendment right to remain silent at the time of his arrest.

Appellant's wife engaged the prosecutrix, a 14-year-old girl, hereinafter referred to as the baby-sitter, the victim or the prosecutrix, to baby-sit for their four young children during the evening of August 22, 1976. Also living in the Schrum home was Betsy Schrum, age 81, an aunt of the defendant. That evening the Schrums departed their home separately, the wife, leaving in an angry mood, to go out with her mother-in-law, and the defendant to go out "with the guys". Schrum returned home about 11 p. m. The victim said his appearance was normal but that she could tell that "he'd had a few drinks". She testified that Mrs. Schrum called after the defendant's return and that the two engaged in a heated argument over the phone. She also testified that later that evening the aunt and the children went to bed. The victim testified that she then went into the bathroom took off her street clothes, put on a "granny gown", but left on her bra and panties; that when she came out of the bathroom the defendant called to her to come into his room to talk to him; and that during a rather lengthy and rambling conversation, Schrum related his experiences with various girl friends and told her of certain violent actions that he had taken toward several of them. She said that defendant expressed

admiration for Charles Manson[1] and told her that "he believed in some of the things that Charles Manson did". The prosecutrix stated that she knew who Charles Manson was, and that he "had murdered Sharon Tate". The victim said that following this conversation defendant grabbed her and forcibly had sexual intercourse with her. The act is alleged to have occurred on the floor "halfway in the bedroom and halfway in the little hall". The prosecutrix testified that the defendant did not threaten her. Her statement was that:

> "A. He was telling me to please be quiet. He wasn't threatening me, he wasn't hitting me, but I was scared, petrified, of some of the things he was saying about [what] he had done to his old girl friends, and that was what was running through my mind, and I was thinking to myself, 'Well what would I do if I would have hauled off and tried to hit him or something and his - you know, he could do something to me that he had done to one of his girl friends.' That's what frightened me so bad.

> "Q. Did you scream?

> "A. No, I didn't scream, I just told him to please get off and leave me alone, 'cause I was afraid if I were to scream he could have hit me, he could have done something."

She testified that during the course of the act, "I was trying to push, trying to struggle him off, but he was stronger than I was. I'm not a very strong person."

After the alleged act of intercourse, the victim went into the children's room and spent the rest of the night in bed with defendant's daughter. She said that she was afraid to leave the room and call for help because she would have had to pass defendant's bedroom to get to the only exit or to the telephone. She also said that after the incident, Schrum apologized, saying: "I'm sorry that I raped you", and that at one point he said, "If you took me to court saying that I had done this, . . . I would plead guilty." She also stated that the following morning the defendant came back into her bedroom and "handed me $5"; and that again he said "he was sorry, and that really - to top it off, as upset as I was, makes you feel kind of cheap".

---

[1] Charles Manson was convicted of the murder of Sharon Tate, a film star.

Mrs. Schrum apparently returned home very late during the night. She testified that she slept on a couch in the living room. The next morning, August 23, 1976, she took the victim home. The girl did not report the incident to defendant's wife. En route Mrs. Schrum told the baby-sitter that she was going to get a divorce from her husband and asked if she would baby-sit for her again after she had gotten her own apartment. The girl said she would. The victim made no report of the rape to her mother until late that afternoon.

After the incident was reported to the mother an examination and laboratory analysis was made of the victim at the Medical College of Virginia. The physician making the examination, Dr. Wanda Radford, testified that there was no evidence of trauma; that the girl "did not have a complete hymen intact", which could be evidence of sexual intercourse, but not necessarily so. The doctor said the prosecutrix had the remnants of a hymenal ring and her examination disclosed small, slight lacerations. She concluded that "it would appear that she has had some intermission into her vagina at some time within a very recent period. What that is, I can't tell you".

No bruises were found on the girl's body and no physical evidence was obtained. The girl said that she took a shower prior to the doctor's examination and that she destroyed the undergarments she was wearing at the time of the alleged rape.

The defendant testified in his own behalf and emphatically denied the entire incident. He presented evidence that the prosecutrix was sexually promiscuous and on one occasion had been observed engaging in the act of oral sodomy. The Commonwealth presented a rebuttal witness who testified to the girl's good reputation for truth and veracity, as contrasted to testimony given by defense witnesses that her reputation was bad.

While the defense recognizes that a prosecutrix's uncorroborated testimony can suffice to support a rape conviction, a long line of cases is cited for the proposition that such a conviction cannot stand where that testimony is contrary to human experience. Schrum argues that the testimony of the prosecutrix is so incredible as not to be worthy of belief. He says it is unbelievable that a 31-year-old married man would rape a 14-year-old girl in the

doorway of his bedroom, with his 81-year-old aunt sleeping in a bedroom next door, and with four children asleep in bedrooms very near the place where the rape is alleged to have occurred. He argues that for the act of rape to have occurred, as the victim claimed, it would have occurred within plain view of his nine and eleven-year-old stepsons. He further argues that there was no evidence of any threats made, violence used, or any resistance offered by the girl; that "a simple scream" on her part would have awakened some or all of the other five parties who were sleeping in the residence within a few feet of where the rape is alleged to have occurred. He also calls attention to the failure of the prosecutrix to promptly report the incident to the defendant's wife, to her own mother or to anyone.

It is well established that to convict for forcible rape there must be evidence of some show of force sufficient to overcome resistance. However, a victim is not required to resist to the utmost of her physical strength if she reasonably believes that resistance beyond that which she offered would be useless and would have possibly resulted in serious bodily injury to her. *Barnett v. Commonwealth*, 216 Va. 200, 217 S.E.2d 828 (1975). The Commonwealth's case depends upon the uncorroborated testimony of the victim, a 14-year-old girl who was allegedly confronted with a 31-year-old man, in a strange home, under adverse circumstances. Her testimony is that she was "petrified" of defendant from what he said he had done to his former girl friends. The Commonwealth points to the age differential between the parties, her fear, the superior strength of the man, and the strange surroundings, and says that the evidence is sufficient to sustain his conviction.

The issue is one of fact and one to be resolved by the trier of the fact. In the instant case the jury saw and heard the witnesses testify and by its verdict resolved the conflicts in the evidence against the defendant. It believed the testimony of the prosecutrix that she was forcibly raped. This verdict has the approval of the trial judge. We cannot say that the evidence was insufficient to support the verdict.

We turn now to defendant's other assignment of error. During the Commonwealth's case in chief the prosecution called Detective Thomas Howell, the investigating officer. In the course of his examination the following exchange occurred between the witness and the Assistant Commonwealth's Attorney:

"Q. Det. Howell, did at a later time you have an occasion to talk to the defendant in regard to the matter before the Court today?

"A. Yes, sir, I did.

"Q. Where did you see him, sir?

"A. He came to police headquarters on the 23rd day of August, 1976, in the company of his attorney.

"Q. Is that the first time you'd talked to him?

"A. That was my first contact, yes, sir.

"Q. At that time was a warrant outstanding against him?

"A. Yes, sir, one had just been obtained.

"Q. The person obtaining that warrant was whom, sir?

"A. Was Phyllis Jenkins, the mother of the child.

"Q. Did you have an occasion to interview Mr. Schrum in regard to the charges against him?

"A. As I said, he was with his attorney and his attorney advised him not to make any statement at this time.

"MR. LEWANE: Judge, I object, and I move for a mistrial.

"THE COURT: All right. Overruled.

"Q. You took no statements from the defendant?

"A. No, sir, I took no statements from Mr. Schrum.

"Q. Were his rights read to him?
"A. Yes, sir.

"Q. Did he execute a rights waiver?

"A. Yes, sir.

"Q. That's all I have of this witness, Your Honor."

And on cross-examination the following exchange occurred between Detective Howell and counsel for the defendant:

"Q. Officer, Howell, is it possible because of the length of time, that you don't recall the fact that Mr. Schrum may have told you that he was not guilty of this crime?

"A. It's possible.

"Q. Did you write down anything that was said?

"A. No, sir. I took no notes at that time.

"Q. So it is possible that he told you that he was not guilty?

"A. It's possible.

"Q. All right. Is it also not a fact that an arrangement was made to - for Mr. Schrum to appear at a convenient time for all parties, to the police department, in reference to these charges?

"A. Yes, sir. It was made - an appointment was made for him to come in.

"Q. It wasn't a situation where he was arrested or, you know, everything was all arranged?

"A. Yes, sir, it was voluntary.

"Q. No further questions.

"MR. NANCE: No further questions of Officer Howell, Your Honor.

"THE COURT: All right. Of course, you understood, as the Jury may not, that the man has a right to follow his attorney's advice, or not answer, or the attorney to tell you that he didn't want his client to make a statement. That's not unusual, is it?

"DET. HOWELL: No, sir, that's not unusual."

■ Schrum says that the trial court erred in failing to grant the requested mistrial after the impermissible testimony regarding Schrum's post-arrest silence had been heard by the jury. The defendant argues that the trial court compounded its error when it voluntarily asked the Commonwealth's witness whether it was unusual for an accused to follow his attorney's advice to remain silent; that this was neither a curative jury instruction nor a direction or admonition to the jury to disregard a question and

answer, but was an observation addressed to the detective which had the effect of placing emphasis and focusing attention on the question of the prosecutor and the answer of the detective.

In the instant case the defendant was not apprehended by any officer. Apparently he learned that the mother of the prosecutrix had preferred charges, or intended to charge him with rape. He employed an attorney and arrangements were made for defendant's voluntary appearance at the police station at a convenient time. The defendant says that the circumstances of his surrender to arrest, the advice of his attorney that he make no statement, and his refusal to make any statement, were all matters well known to the prosecution.

The argument of the defense is that nothing should have been said about his failure to make a statement, and that his motion for a mistrial should have been granted. Continuing, the defense further says that if the trial court was to make any observation the jury should most certainly have been told that by remaining silent the defendant was simply exercising a constitutional right and that such silence was not an issue which the jury was entitled to consider in determining the guilt or innocence of the defendant.

In *Dean v. Commonwealth*, 209 Va. 666, 670, 166 S.E.2d 228, 231 (1969), we held that the Fifth Amendment precludes the prosecution from using an assertion of the privilege against self-incrimination to discredit or convict the person who asserted it. We said:

"We also interpret Section 8 of the Virginia Constitution, which provides that no person shall 'be compelled in any criminal proceeding to give evidence against himself', as precluding the use of an assertion of such privilege to discredit or convict the person who asserted it."

*See also Reid v. Commonwealth,* 213 Va. 790, 794, 195 S.E.2d 866, 869 (1973), where we said that " [W]e do not recede from our holding in *Dean.* "

In *United States v. Ghiz,* 491 F.2d 599 (4th Cir. 1974), the Court found the testimony of a prosecution witness regarding the defendant's silence inadmissible and reversed the defendant's conviction. It held.

"The Supreme Court has clearly held that a defendant's refusal to answer questions cannot be used against him at trial. . . and this Court has recently indicated that if, in declining to answer certain questions, a criminal accused invokes his fifth amendment privilege or in any other manner indicates he is relying on his understanding of the Miranda warning, evidence of his silence or of his refusal to answer specific questions is inadmissible." 491 F.2d at 600.

*Doyle v. Ohio,* 426 U.S. 610 (1976), is dispositive of the case under review. There the defendants were given the *Miranda* warnings, and they made no statement at the time of their arrest. Subsequently, and at trial, they took the stand and contended that they had been "framed". The prosecution sought to cross-examine them as to why they had not told the frame-up story to the police at the time of their arrest. The Court held that the use for impeachment purposes of defendants' silence at the time of arrest and after they received the *Miranda* warnings violated the Due Process Clause of the Fourteenth Amendment. Mr. Justice Powell, speaking for a majority of the Court, said:

"Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. Mr. Justice White, concurring in the judgment in *United States v. Hale,* 422 U.S., at 182-183, 95 S.Ct., at 2139, put it very well:

"'When a person under arrest is informed, as *Miranda* requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony . . . . Surely Hale was not informed here that his silence, as well as his words, could be used against him at trial. Indeed, anyone would

reasonably conclude from *Miranda* warnings that this would not be the case.' " [Footnotes omitted]. 426 U.S. at 619.

After finding that the use for impeachment purposes of defendant's silence was impermissible in *Doyle,* the Court further observed: "The State has not claimed that such use in the circumstances of this case might have been harmless error." 426 U.S. at 619-20. In the instant case the Attorney General argues that the alleged constitutional error, if any, "was miniscule and harmless". He says that the few remarks regarding the defendant's silence at the time of arrest did not produce a trial which was so fundamentally unfair as to deny the defendant due process of law. He further argues that Mr. Justice Powell's opinion indicates that the result in *Doyle* might have been different had the state there claimed the error was harmless in the circumstances of that case. However, for the state to have made a bona fide claim to that effect, the evidence of guilt must have been overwhelming, or the error committed must have in effect been insignificant.

The record discloses that a previous trial of Schrum resulted in a hung jury and that in the case under review the jury imposed minimum punishment. There are significant conflicts in the evidence. Although there was evidence from which the jury could have found the verdict it did find, we cannot say that no other verdict could have been reached. Neither can we conclude that the exchange between the prosecutor and the detective was harmless error beyond a reasonable doubt and that it was not prejudicial to the defendant. *Cf. Chapman v. California,* 386 U.S. 18 (1967), *reh. denied,* 386 U.S. 987 (1967).

Accordingly, the judgment of the lower court is reversed, and the case is remanded for a new trial.

*Reversed and remanded.*