RONALD DALE FAIN

v.

COMMONWEALTH OF VIRGINIA

No. 0117-89-3

Decided June 12, 1990

COUNSEL

Randal J. Duncan (Jenkins & Quigley, on brief), for appellant.

Thomas C. Daniel, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**WILLIS, J.**—Ronald Dale Fain was convicted by a jury of second degree murder of Buddy Montgomery and of using a firearm in the commission of that murder. Fain testified that the shooting was accidental. On cross-examination he was asked why he had not given that explanation to the police officers and other witnesses when the case was being investigated. He moved for a mistrial, contending that this violated his constitutional right against self-incrimination. He appeals the denial of that motion. Upon review, we find no error and affirm the convictions.

On November 3, 1987, an argument developed between Fain and the victim, Buddy Montgomery. Steve Cox, who was present, heard a shot. Turning around, Cox saw Fain shoot Montgomery in the back. As Montgomery fell and moaned, Fain told him to shut up or he would kill him. Fain then pointed the pistol at Cox, who was frightened and ran from the house to get help.

Arlen Montgomery, the victim's uncle, arrived at the scene before the police. He inquired about Buddy, and Fain told him, "I shot him twice. I don't know." Deputy Sheriffs Akers, Alderman, and Normandin arrived. Deputy Alderman took Fain off the porch to the edge of the road. Fain asked Alderman to look at the left side of his face. Alderman saw a small scratch. He testified

that "Mr. Fain made the statement that a person had the right to protect theirself and, uh, he had to do what he had to do." Deputy Akers walked up to where Fain and Deputy Alderman were standing. Deputy Alderman asked him to shine his flashlight on Fain's forehead. Deputy Akers testified that Fain "had a small place in his eyebrow just above it." Deputy Akers commented, "Looks like a small scratch." Fain responded, "That was enough, isn't it?"

Deputy Akers walked to the front door of the house, saw someone lying on the floor inside, and went back to where Fain was standing. Fain asked him how Buddy was doing. Deputy Akers replied that he didn't think that he was hurt too bad, that he looked all right. Fain then told Akers that he didn't think that he had hurt him too bad, but he had to do what he had to do. Akers testified further that Fain "made a statement there that he'd asked Buddy to leave several times, and he said he wouldn't leave, so, you know, he'd done what he had to do."

Deputy Alderman then asked the defendant to have a seat in his police car, told him that he was not under arrest, and advised him of his *Miranda* rights. Fain said that he would rather not make any statements or write anything until he talked to an attorney and saw how Buddy Montgomery was. However, while seated in Alderman's car, in Deputy Normandin's presence, Fain said to his mother, "I had to shoot a man, mama. It was just Buddy Montgomery. He's had it coming."

Deputy Kinzer described the following conversation between Fain and Arlene Chapman which occurred in his presence at the Sheriff's department later that evening:

Ronnie said, "Man has a right to protect himself. Are you mad at me?" And he was talking to Miss Chapman. And she said, "No. You done what you had to do." And Ronnie said, "If a man can't protect"- And I didn't catch what he said. - "it's bad." And Miss Chapman said, "Don't worry about it. He had it coming." And Ronnie, again: "I guess all of them down there are mad at me." Miss Chapman: "I wouldn't worry about them. They know how Buddy was. He was all time causing trouble." Ronnie, again: "I kept telling him to leave." Miss Chapman: "I know." Then, Ronnie: "What the hell was Wimpy doing down there?" Miss Chapman: "I

don't know. He was there before the police." And I spoke up about that time, and I was asking Ronnie, I said, "Did you say he was there before any police?" Ronnie: "Hell, yeah. He knocked on the door. Said he was the police. I told my girlfriend not to open the door until the police got there." And I asked him, again, I said, "You say he knocked on the door and said he was the police?" Miss Chapman spoke up and said, "That's right. How did he get there before you all?" I answered her, "I don't know." And then Ronnie, again: "You must - He must have a scanner. He didn't have no business there." Miss Chapman: "I know." Ronnie, again: "Well, he had it coming for a long time." Miss Chapman: "That's right. He came in our house one time we didn't know he was there." Ronnie: "I still say I had a right to protect myself. Do you know his condition?" I answered him, "No more than a while ago. He's taking a lot of blood." And Ronnie, again: "Ah, it'll be O. K. Don't you think a man has a right to protect his home?" And I answered, "Well, maybe, in some cases." Ronnie, again: "You would do the same as I did."

Deputy Kinzer testified that after Miss Chapman left, Steve Cox came into the room. He testified as to the following conversation in his presence between the defendant and Cox:

And Mr. Cox came in, his statement: "Ronnie, I'm sorry but I had to tell what I seen." Ronnie: "That's O. K." Mr. Cox: "I like both of you." Ronnie: "Hey, we're still friends." Mr. Cox: "I love you as a brother, but I had to tell the truth." Ronnie: "No problem. I know you had to tell it like it was. All you can do is tell the truth." Mr. Cox: "That's right." Ronnie: "How is he doing?" Mr. Cox: "They tell me he might not make it." And then Ronnie: "I hope" - And then I didn't catch what he said there. - Uh, Mr. Cox, again: "I sure hope he does. I'm going to the hospital to check on him." Ronnie: "I don't think I would go. All of the Montgomery's [sic] will be there. They are probably all mad." Mr. Cox: "I don't think so." Ronnie: "Maybe not at you, but me. Tell them I'm sorry, but I had to protect what is mine."

All of the foregoing conversations and statements were received in evidence without objection. Fain makes no contention that they were elicited in violation of his rights.

At trial, Fain testified that he and Montgomery engaged in a struggle, during which Montgomery knocked him into the refrigerator. He said that he then got his pistol, pointed it at Montgomery and ordered him to leave. He said that Montgomery grabbed the pistol, and that as they struggled the pistol fired. He did not at that time think that Montgomery had been hit. They continued to fight, and Montgomery knocked him backwards, causing him to fall over a chair. At that time the pistol fired again. He denied that he intended to shoot Montgomery, but said that both times the pistol discharged accidentally. On cross-examination he was referred to his statements at the scene, and the following dialogue ensued:

Q. And at that time, did Deputy Akers indicate in so many words to you — "Well, looks like a small scratch." - pointing up over to the left side of your eye?

A. Yes, sir.

Q. And, uh, did he also — Did you say at that time, as he's testified, "That's enough, ain't it?"

A. I don't remember exactly what I did say, but, uh, I think I was gonna say something else. And the officer was around there, and he — When Arlen Montgomery came up and said there was more Montgomery's [sic] on the way, the deputy told me to go get in the car.

Q. Do you deny saying, "That's enough, ain't it?"

A. I don't deny it, but I don't remember.

Q. Now, Deputy Akers indicated that he then, I think, checked in the house to see how things were, and came back and had further conversation with you at which time, uh, you asked how he was doing — how Buddy was doing. Do you remember that?

A. Yes, sir.

Q. You remember having that conversation with Deputy Akers inquiring about Buddy's condition?

A. I didn't really know it was Akers there, but I remember asking an officer how Buddy was.

Q. O. K. Well, an officer.

A. Yes, sir.

Q. And Deputy Akers has testified that he said, and of course, it turned out that he was very wrong, that he didn't think Buddy was hurt too bad.

A. That's what he told me.

Q. Right. And then, uh, he's testified that you went on to say, "He'll be all right. I didn't hurt him too bad. But I told him to leave and he wouldn't."

A. Yes, sir.

Q. Is that what you said to him then?

A. I don't quite remember the exact words but they were similar to that.

Q. Uh-huh. You didn't tell Deputy Akers that there, uh, that — that Buddy was whipping you, or that there had been a struggle for the gun and it had accidentally gone off. You didn't do — You just said he, uh, he wouldn't leave.

A. I told one officer out there that he had struck me.

Q. Right. Right. But you didn't tell anybody about any struggle or anything like that, did you?

A. It just happened so fast, and, uh, everybody was around there, and they just told me to get to the car, and I didn't — I didn't get to talk to too many people and tell them anything.

Q. Yeah. And you never indicated to anybody that the gun went off accidentally, did you?

A. I didn't make any statement.

Q. I'm — I'm not talking about statements. I'm talking about there when you were talking to these officers. You talked to Deputy Akers. You talked to Deputy Alderman.

A. I was more concerned with Buddy Montgomery's condition.

Q. I understand that. My question is, during the course of these things that you said, you never indicated at any time that there was a, uh, uh, uh, an accidental shooting, did you?

Counsel for the defendant then moved for a mistrial, arguing that the foregoing questions asserted against the defendant his invocation of his right to remain silent and violated his constitutional right against self-incrimination. The court denied the motion.

 Fain relies on *Doyle v. Ohio*, 426 U.S. 610 (1976), and on *Durant v. Commonwealth*, 7 Va. App. 454, 375 S.E.2d 396 (1988). In *Doyle*, the defendant, upon being arrested and advised of his *Miranda* rights, made no statement. In his testimony at trial, he offered an exculpatory explanation. On cross-examination, the prosecutor impeached the defendant by asking why he had failed to give this account to the police upon his arrest. The Supreme Court held that the use for impeachment purposes of the defendant's exercise of his right to remain silent after receiving the *Miranda* warning violates the due process clause of the Fourteenth Amendment. 426 U.S. at 619. The Court noted that the *Miranda* warnings assure an accused, at least implicitly, that his decision to remain silent cannot be used against him. *Id.* at 618. The Court quoted from Justice White's concurrence in *United States v. Hale*, 422 U.S. 171, 182-83 (1975),

[I]t does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony.

426 U.S. at 619.

In *Durant*, the defendant was charged with aggravated sexual battery committed upon the person of her daughter. Upon her arrest, she was advised of her *Miranda* rights and chose to remain silent. At trial she testified that she had committed the acts under coercion by her husband. When asked why she never told anyone about these incidents, she replied that she did not have a telephone at home and that her husband was always with her. When asked by the Commonwealth's Attorney why she did not tell the whole story to the police, she replied, "Because I told them that I wanted to talk to my lawyer first and that is what I did." The Commonwealth's Attorney then commented, "[S]o instead of coming forth and spewing forth the whole story, you made the statement that you wanted to talk to somebody else?" The defendant's motion for a mistrial was denied. We reversed the conviction, holding,

> Since Durant did not waive her right to remain silent and the Commonwealth referred to her post-arrest, post-*Miranda* warnings silence both during cross-examination of Durant and in closing argument, *Doyle* is dispositive and mandates reversal of the defendant's conviction. While the use of Durant's pre-arrest silence is proper for impeachment of her duress defense. . . use of Durant's post-arrest, post-*Miranda* silence is a violation of both her right to remain silent and a denial of fundamental fairness.

*Id.* at 460, 375 S.E.2d at 399 (citation omitted).

In *Schrum v. Commonwealth*, 219 Va. 204, 246 S.E.2d 893 (1978), the defendant, accompanied by his attorney, surrendered himself at the police station. At trial, the investigating officer testified that Schrum, upon advice of his attorney, had made no statement. The Supreme Court of Virginia held that this employed against Schrum his invocation of his right against self-incrimination. *Id.* at 211, 246 S.E.2d at 898. The factual situations in *Doyle*, *Durant* and *Schrum* are distinguishable from the present case. In each of those cases the defendant chose to remain silent after receiving either the *Miranda* warning or advice from

his attorney. However, both before[1] and after he received the *Miranda* warnings, Fain spoke freely and voluntarily to the investigating officers and to his friends in the presence of the police officers. He discussed and explained what happened and he undertook to give his side of the story. These accounts, which were consistent with each other, were inconsistent with his trial testimony that the gun discharged accidentally. By directing Fain's attention to these prior statements, the Commonwealth's Attorney did not use against him his post-*Miranda* warning silence, but rather sought to impeach him through the use of his prior inconsistent statements. This was proper cross-examination.

In *Anderson v. Charles*, 447 U.S. 404 (1980), the defendant testified that he had stolen a car from a particular location. He was asked on cross-examination whether he had not admitted to an investigating officer that he had stolen the car from a different particular location. Approving this line of cross-examination as not violative of *Doyle*, the Supreme Court said:

> *Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent.

*Id.* at 408.

*Charles* was applied in *Squire v. Commonwealth*, 222 Va. 633, 283 S.E.2d 201 (1981). In that case, the defendant, arrested on charges of sodomy, robbery and attempted rape, was advised of his *Miranda* rights. Acknowledging that he understood these, he consented to an interview. The officer testified that during the interview the defendant said that he would like to see the person who had accused him. The victim was brought in and identified the defendant. The officer testified, "And that was it." At trial, the defendant presented an alibi, saying that he was with two other men at the time of the crime. On cross-examination, the

---

[1] *See Fletcher v. Weir*, 455 U.S. 603 (1982) (per curiam) (in the absence of the sort of affirmative assurances embodied in the *Miranda* warning, a state may permit cross-examination about post-arrest silence).

Commonwealth's Attorney asked Squire why he did not tell the police about those two men. Squire contended that this cross-examination violated his right against self-incrimination because he was entitled to refrain from giving information to the police. Rejecting this argument, the Supreme Court of Virginia said:

> In the present case, Squire did not remain silent after receiving his *Miranda* warnings. Harding testified that he interviewed Squire, and Squire conceded that he answered Harding's questions although he could not remember what questions were asked. During the interview, Squire asked to be confronted by his accuser, an action inconsistent with an intention to maintain silence.
>
> Squire could have exercised his constitutional right to remain silent in accordance with the *Miranda* warning that he acknowledged having received. If he had done so, he could not properly have been cross-examined at trial about his failure to mention his alibi to the investigating officer. Once he broke his silence, however, to answer questions under pretrial police interrogation and to request to see his accuser, he did not have the right thereafter to remain silent selectively and then prevent the prosecution from cross-examining him about his failure to reveal the exculpatory facts to which he testified.

*Id.* at 638, 283 S.E.2d at 204-05.

Both before and after receiving his *Miranda* warning Fain freely and voluntarily gave to investigating officers and to friends in the presence of investigating officers what purported to be a comprehensive account of the shooting. The inconsistencies between those accounts and his exculpatory trial testimony were a proper subject for cross-examination. The motion for a mistrial was properly denied.

For the foregoing reasons, the judgment of the trial court is affirmed.

*Affirmed.*

Koontz, C.J., and Moon, J., concurred.