PRESENT: Lemons, C.J., Goodwyn, McClanahan, Powell, Kelsey, and McCullough, JJ., and Millette, S.J.

COMMONWEALTH OF VIRGINIA

v. Record No. 160879

OPINION BY
JUSTICE D. ARTHUR KELSEY
JUNE 1, 2017

LASHANT LEONARDO WHITE

FROM THE COURT OF APPEALS OF VIRGINIA

After denying a motion to suppress, the trial court convicted Lashant Leonardo White of possession of heroin with the intent to distribute, third or subsequent offense, in violation of Code § 18.2-248.[1] The Court of Appeals reversed the conviction, holding that the trial court had erred in denying White's motion to suppress and further held that the error was not harmless. We reverse the judgment of the Court of Appeals and reinstate the conviction.

I.

A.

On appeal, we state the facts "in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences." *Evans v. Commonwealth*, 290 Va. 277, 280, 776 S.E.2d 760, 761 (2015) (citation omitted). "This standard requires us 'to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" *Id.* (quoting *Jones v. Commonwealth*, 279 Va. 521, 528, 690 S.E.2d 95, 99 (2010)).

When considering whether to affirm the denial of a pretrial suppression motion, an appellate court reviews not only the evidence presented at the pretrial hearing but also the evidence later presented at trial. *See Carroll v. United States*, 267 U.S. 132, 162 (1925) ("If the evidence given on the trial was sufficient, as we think it was, to sustain the introduction of the

---

[1] The trial court also convicted White of marijuana possession, in violation of Code § 18.2-250.1, but he did not appeal that conviction.

[contested evidence], it is immaterial that there was an inadequacy of evidence when application was made for its return. A conviction on adequate and admissible evidence should not be set aside on such a ground."); *Ricks v. Commonwealth*, 39 Va. App. 330, 336 n.3, 573 S.E.2d 266, 269 n.3 (2002) (applying the principle described in *Carroll*); *DePriest v. Commonwealth*, 4 Va. App. 577, 583, 359 S.E.2d 540, 542-43 (1987) (same); *see also United States v. Han*, 74 F.3d 537, 539 (4th Cir. 1996) (noting that "federal courts have held uniformly that an appellate tribunal may consider evidence adduced at trial that supports the district judge's ruling" made at a pretrial suppression hearing).[2]

B.

One evening in October 2013, three Norfolk police investigators responded to a citizen's complaint that narcotics activity was occurring at a local motel. That motel had been the situs of "numerous" similar complaints, J.A. at 58, and the location of "several" prior drug and prostitution arrests, *id.* at 61. One of the investigators testified that prior suspects revealed the motel as being "their area of choice as far as meeting and making these [drug] transactions." *Id.* at 58. It was a "known drug motel," *id.* at 70, and a virtual "breeding ground for drugs and prostitution," *id.* at 120-21.

---

[2] In contrast, as an appellate basis for reversing a criminal conviction based on an erroneous pretrial ruling, evidence at trial becomes relevant only if the defendant renews his pretrial motion at trial. Only in doing so does an appellant satisfy Rule 5:25 by inviting the trial court to reconsider its pretrial ruling in light of the actual evidence presented — rather than merely relying solely upon the charging documents, pretrial proffers of the parties, or cursory evidentiary presentations as the trial court sometimes must do when deciding the issue prior to trial. *See Holloman v. Commonwealth*, 65 Va. App. 147, 158, 775 S.E.2d 434, 440 (2015); *Allen v. Commonwealth*, 58 Va. App. 618, 621, 712 S.E.2d 748, 749 (2011); *see also Oliver v. Commonwealth*, Record No. 0642-14-2, 2015 Va. App. LEXIS 75, at *6 n.4 (Mar. 10, 2015) (unpublished) (applying the waiver principle described in *Allen* to the failure to renew a pretrial motion to suppress at trial); *accord United States v. Ross*, 510 F.3d 702, 711-12 (7th Cir. 2007); *United States v. Rollins*, 301 F.3d 511, 518 (7th Cir. 2002).

2

Upon arriving at the motel, the investigators saw White standing in the parking lot. A vehicle came into the lot, circled around, and its driver eventually stopped to talk to White. He walked up to the driver's side window and began "leaning" into the vehicle with both arms inside. *Id.* at 122, 136. He later emerged out of the window with a handful of cash in one hand and a cell phone in the other. Based upon their experience and training, the investigators believed that White had engaged in a drug transaction. Though they did not see the transfer of any specific narcotics as White leaned into the vehicle, all of the other circumstances suggested that such a transfer had likely occurred. *Id.* at 74.

The investigators approached White, mentioned their suspicions, and asked for permission to search him. After White had consented, the officers searched him and found on his person:

- three baggies of heroin, consisting of 4.306 grams of "raw heroin" that had not been "cut" or diluted for retail sale, packaged in three different weights: approximately 1/8 ounce (or "3.53 grams"), 1 gram, and 1/2 gram, *id.* at 130-32;

- $644 in currency consisting of 31 twenty-dollar bills, 1 ten-dollar bill, 2 five-dollar bills, and 4 one-dollar bills, which were organized by "denominations in different pockets," *id.* at 129-30;

- two cell phones, *id.* at 129; and

- one baggie with .839 grams of marijuana, Commonwealth's Ex. 6.

The investigators found no drug paraphernalia on White that would have allowed him to use either the heroin or the marijuana.

After his arrest, White asked the investigators to "find his girlfriend Tanya at Room 219" of the motel. J.A. at 87. He did not claim that he had rented the room or suggest that any of his personal property would be found there. Nor did he voice any objection to the police searching the room when he made his request. Pursuant to White's request, one of the investigators went

3

to the motel room and knocked on the door. A woman named "Tanya" opened the door and let the investigator in after he had explained that White had been arrested.

Tanya "seemed to have control of the room," which led the investigator to believe that she was "the lessee of the room." *Id.* at 88. The investigator asked for permission to search the room, and she agreed. During the search, the investigator found a gray plastic bag on the bed. Tanya volunteered that the bag "belonged" to White. *Id.* at 87. She said nothing, however, to disclaim either her apparent joint possession of the bag or her access to it. Nor did she at any time "object to [the investigator] looking in the bag." *Id.* at 93. Hearing no such objection, the investigator opened the bag and found a digital scale, 200 empty capsules, and smaller plastic baggies.

C.

At a bench trial, a police investigator testified as an expert in "packaging, distribution, and sale of illegal street drugs." *Id.* at 128. He offered two distinct opinions in response to the Commonwealth's questioning. He was first asked to "just consider the evidence that was recovered from the defendant" during the search of his person. *Id.* at 129. Based solely on this evidence, the expert opined that the evidence found on White's person, by itself, was inconsistent with personal use for several reasons.

To begin, the expert explained that White possessed "raw" heroin that drug dealers break down for retail sale "with a cutting agent" that doubles and sometimes triples the quantity sold to users. *Id.* at 132-33. The expert added that the quantity of raw heroin found on White's person, after cutting, could produce as many as 129 capsules of heroin. *Id.* at 133. Typical heroin users, the expert testified, have no more than 2 to 4 capsules of heroin on them at any one time. *Id.* at 145. Heroin users, as opposed to heroin dealers, "usually have just a certain amount to feed their fix." *Id.* at 130. The expert's testimony suggested that a typical heroin user would not possess

4

the amount of raw heroin discovered on White — enough to fill 43 capsules with raw heroin or as many as 129 capsules after cutting.

Other circumstances, the expert testified, also refuted any reasonable hypothesis that White possessed the raw heroin for personal use only. According to the expert, mere users must have some way of actually using the drug. But as the expert explained, White did not possess any smoking devices, capsules, syringes, or other user "work kit[s]" that would allow him to use any of the raw heroin in his possession. *Id.* at 138-39; *see also id.* at 143-44. What White did have in his possession, however, was a large amount of currency ($644) organized by denomination in separate pockets consisting of 31 twenty-dollar bills, 1 ten-dollar bill, 2 five-dollar bills, and 4 one-dollar bills. *See id.* at 130.

The expert stated that having different "denominations in different pockets" is consistent with drug distribution. *Id.* at 130-31. The expert added that the possession of two cell phones also indicates drug distribution because dealers use one cell phone as a "drug work phone" and the other as a "personal phone." *Id.* at 131. When coupled with other indicia of drug distribution, the expert opined that "two cell phones . . . goes exactly along with a drug dealer" and what he would "normally have with him." *Id.* at 139. Finally, the raw heroin found on White was separated in three baggies, each with different weights. According to the expert, this fact further supported the inference that the heroin had not been purchased in standard packaging for a user.

After delivering a lengthy opinion based solely upon the evidence discovered on White, the expert was then asked only two questions by the prosecutor about the items found in the gray plastic bag in his girlfriend's motel room. The first question asked whether the items in the bag were important. The expert explained that all of the items (the digital scale, the 200 empty capsules, and the plastic baggies) were useful for drug distribution. The second question simply

5

asked the expert to confirm that there were 200 empty capsules found in the bag. These two answers only occupied 10 lines of text in the trial transcript. *See id.* at 134. At no time did the expert suggest that his earlier opinion about the items found on White's person was contingent on the discovery of the items in the plastic bag in the motel room.

After the Commonwealth concluded its case, White offered no evidence, exhibits, or witnesses. In closing argument, the prosecutor argued for a conviction of possession of heroin with the intent to distribute, third or subsequent offense, based solely upon the incriminating evidence found on White's person. *See id.* at 148-49. The prosecutor did not mention the incriminating evidence found in the plastic bag recovered from Tanya's motel room. The trial court subsequently found White guilty of possession of heroin with the intent to distribute, third or subsequent offense. The court did not single out any evidence in its ruling. Instead, the court generally mentioned the expert's opinion concerning the amount of heroin and the "other indicia of distribution" and referenced the "combination or the accumulation of all the various factors" without further explanation. *Id.* at 152.

D.

White appealed to the Court of Appeals. In a published opinion, the Court of Appeals vacated White's conviction for possession of heroin with the intent to distribute, third or subsequent offense. *White v. Commonwealth*, 66 Va. App. 333, 367, 785 S.E.2d 239, 256 (2016). The Court of Appeals held that the trial court erred in denying White's motion to suppress and further held that this error was not harmless. *Id.* at 366-67, 785 S.E.2d at 256. On the harmless-error question, the Court of Appeals focused on the trial court's remark about the "various other indicia of distribution" and the likelihood that the trial court had considered the challenged evidence that was found in the plastic bag in the motel room. *Id.* at 366, 785 S.E.2d at 256.

6

The Commonwealth now appeals to us and argues that the trial court did not err, and, even if it did err, the Court of Appeals "ignored the overwhelming evidence and did not apply the proper legal standard" in holding that the error was not harmless. Appellant's Br. at 19.

II.

A.

The Commonwealth contends that the Court of Appeals erroneously distinguished this case from *Glenn v. Commonwealth*, in which we held that a grandfather's apparent authority to consent to the search of his home included the authority to search his grandson's backpack within the home. 275 Va. 123, 137-38, 654 S.E.2d 910, 917 (2008), *aff'g* 49 Va. App. 413, 642 S.E.2d 282 (2007). White argues that *Glenn* is inapplicable here because Tanya, despite her unqualified permission for the officers to search the motel room, stated that plastic bag "belonged to" White. J.A. at 87. In response, the Commonwealth points out that Tanya's remark did not eliminate the reasonable inference that, while the bag may have belonged to White, both he and Tanya jointly possessed it in her motel room and on her bed. Either of two joint possessors, absent the express objection of one of them, may consent to a search under *Georgia v. Randolph*, 547 U.S. 103, 109 (2006).

We see no reason to resolve this nuanced contest over apparent-authority principles governing consent searches under the Fourth Amendment. As we have often said, "[t]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Commonwealth v. Swann*, 290 Va. 194, 196, 776 S.E.2d 265, 267 (2015) (citation omitted).[3] In this case, the best and narrowest ground is our conclusion that the alleged trial court error, if error at all, was harmless as a matter of law.

---

[3] *See also Board of Supervisors of Loudoun Cty. v. State Corp. Comm'n*, 292 Va. 444, 453 n.8, 790 S.E.2d 460, 464 n.8 (2016); *Hampton Rds. Bankshares, Inc. v. Harvard*, 291 Va.

7

B.

1.

The harmless-error concept is no mere prudential, judge-made doctrine of appellate review. Harmless error is a legislative mandate, which has been part of our statutory law since the early 1900s, and limits the adjudicatory power of Virginia appellate courts.

> Whatever may be the law elsewhere, or whatever it may have been aforetime in this State, since the adoption of the Code of 1919 there has existed in this State a statute which puts a *limitation on the powers of this court* to reverse the judgment of the trial court — a limitation which we must consider on every application for an appeal and on the hearing of every case submitted to our judgment.

*Walker v. Commonwealth*, 144 Va. 648, 652, 131 S.E. 230, 231 (1926) (emphasis added). In doing so, the General Assembly "deliberately engrafted" the harmless-error doctrine into the statutory law of the Commonwealth. *Irvine v. Carr*, 163 Va. 662, 669, 177 S.E. 208, 211 (1934). "Code § 8.01-678 makes 'harmless-error review required in *all* cases.'" *Commonwealth v. Swann*, 290 Va. 194, 200, 776 S.E.2d 265, 269 (2015) (emphasis in original) (quoting *Ferguson v. Commonwealth*, 240 Va. ix, ix, 396 S.E.2d 675, 675 (1990)).

The harmless-error check on judicial power has never been a begrudged limitation, but rather one "favored" by Virginia courts, *Windsor v. Carlton*, 136 Va. 652, 655, 118 S.E. 222, 223 (1923), because it grows out of the "imperative demands of common sense," *Commonwealth v. Proffitt*, 292 Va. 626, 641, 792 S.E.2d 3, 10 (2016) (quoting *Oliver v. Commonwealth*, 151 Va. 533, 541, 145 S.E. 307, 309 (1928)). Harmless error consequently has been "deeply embedded in our jurisprudence." *Gilland v. Commonwealth*, 184 Va. 223, 235, 35 S.E.2d 130, 134 (1945).

---

42, 52, 781 S.E.2d 172, 177 (2016); *Wooten v. Bank of Am., N.A.*, 290 Va. 306, 312 n.6, 777 S.E.2d 848, 851 n.6 (2015); *Alexandria Redev. & Hous. Auth. v. Walker*, 290 Va. 150, 156, 772 S.E.2d 297, 300 (2015).

8

Thus, it is "the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless" lest they "retreat from their responsibility, becoming instead 'impregnable citadels of technicality.'" *United States v. Hasting*, 461 U.S. 499, 509 (1983) (alteration and citation omitted).

"Constitutional error, like other types of error, remains subject to analysis under the doctrine of harmless error." *Foltz v. Commonwealth*, 284 Va. 467, 472, 732 S.E.2d 4, 7 (2012). As the United States Supreme Court has "repeatedly stated, 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'" *Rose v. Clark*, 478 U.S. 570, 579 (1986) (citation omitted); *see also Reid v. Commonwealth*, 213 Va. 790, 795, 195 S.E.2d 866, 870 (1973) ("[T]here is no such thing as a case perfectly tried."). "A perfect trial is one of the things hoped for but as yet [is] an iridescent dream." *Gilland*, 184 Va. at 235, 35 S.E.2d at 135.

For constitutional errors, the harmless-error standard is often restated as asking "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction," a phrase originating from *Chapman v. California*, 386 U.S. 18, 23 (1967). Some argue that, under this standard, error can never be harmless if the factfinder actually considered the erroneously admitted evidence. But if that were true, no errors could ever be harmless because, when conducting a sufficiency review, appellate courts presume that factfinders considered all incriminating evidence in the record contributing to the conviction. *See Perry v. Commonwealth*, 280 Va. 572, 580, 701 S.E.2d 431, 436 (2010) ("[A]n appellate court must consider *all* the evidence admitted at trial that is contained in the record." (emphasis added) (citation omitted)).[4] Erroneously admitted evidence is always presumed to, at least in part, contribute to the conviction.

---

[4] We also presume that the factfinder relied upon any reasonable inferences that could be discerned from the record in support of its decision. *See, e.g.*, *Du v. Commonwealth*, 292 Va.

The *Chapman* standard, however, should not be understood to presume that an error

cannot be harmless if the factfinder considered erroneously admitted evidence. As post-

*Chapman* cases from the United States Supreme Court have repeatedly emphasized, all of the

factors typically considered in the constitutional-harmless-error doctrine[5] seek to answer a

single, ultimate question:

- "The question a reviewing court must ask is this: absent the [constitutional error], is it clear beyond a reasonable doubt that the [factfinder] *would have* returned a verdict of guilty?" *Hasting*, 461 U.S. at 510-11 (emphasis added) (citing *Harrington v. California*, 395 U.S. 250, 254 (1969)).

- The proper inquiry for constitutional harmless error is "whether the [factfinder] *would have* returned the same verdict absent the error." *Washington v. Recuenco*, 548 U.S. 212, 221 (2006) (emphasis added).

- When the "verdict *would have* been the same absent the error, the [constitutional error] is properly found to be harmless," and, for that reason, the error "did not contribute to the verdict obtained" under the *Chapman* standard. *Neder v. United States*, 527 U.S. 1, 17 (1999) (emphasis added) (citation omitted).

- "Judicious application of the harmless-error rule does not require that we indulge assumptions of irrational jury behavior when a perfectly rational explanation for the jury's verdict, completely consistent with the judge's instructions, stares us in the face," and as a result, "we conclude that the 'minds of an average jury' *would not have* found the State's case significantly less persuasive had the [erroneously

---

555, 566, 790 S.E.2d 493, 500 (2016); *Haynes v. Haggerty*, 291 Va. 301, 305, 784 S.E.2d 293, 294 (2016). Moreover, "our appellate review 'is not limited to the evidence mentioned by a party in trial argument or by the trial court in its ruling.'" *Du*, 292 Va. at 566, 790 S.E.2d at 500 (citation omitted); *see also Bolden v. Commonwealth*, 275 Va. 144, 147, 654 S.E.2d 584, 586 (2008); *Commonwealth v. Jenkins*, 255 Va. 516, 522, 499 S.E.2d 263, 266 (1998).

[5] Some of the factors that courts typically consider include: "(1) the importance of the tainted evidence in the prosecutor's case, (2) whether that evidence was cumulative, (3) whether there is evidence that corroborates or contradicts the tainted evidence on material points, and (4) the strength of the prosecution's case as a whole." *Angel v. Commonwealth*, 281 Va. 248, 264, 704 S.E.2d 386, 396 (2011). *See generally* Charles E. Friend & Kent Sinclair, The Law of Evidence in Virginia § 1-9[a], at 84-85 (7th ed. 2012).

admitted evidence] been excluded." *Schneble v. Florida*, 405 U.S. 427, 431-32 (1972) (emphasis added).

This standard is not the same thing as simply asking "whether the legally admitted evidence was sufficient" to support the conviction. *Satterwhite v. Texas*, 486 U.S. 249, 258-59 (1988). The sufficiency standard asks whether a rational jury *could have* found the defendant guilty. The harmless-error standard expressed in *Chapman* instead looks at the other side of the reasonable-doubt spectrum: "Is it clear beyond a reasonable doubt that a rational [factfinder] *would have* found the defendant guilty absent the error?" *Neder*, 527 U.S. at 18 (emphasis added); *accord United States v. Garcia-Lagunas*, 835 F.3d 479, 488 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 713 (2017); *United States v. McFadden*, 823 F.3d 217, 224 (4th Cir. 2016), *cert. denied*, ___ S. Ct. ___, 197 L. Ed. 2d 647 (2017). If so, the constitutional error should be disregarded as harmless.

2.

The unchallenged evidence in this case confirms "beyond a reasonable doubt that a rational [factfinder] *would have* found the defendant guilty absent the error." *Neder*, 527 U.S. at 18. We can confidently come to this conclusion based upon the limited role that the challenged evidence played at trial, coupled with the overwhelming and unchallenged evidence of White's guilt.

The prosecutor did not mention the evidence from the plastic bag found in the motel room in either his opening or closing statements. Instead, he focused entirely on the specific evidence discovered during the personal search of White. All but two of the prosecutor's questions on direct examination of his expert addressed the items found on White. The prosecutor specifically requested and received an expert opinion limited solely to these incriminating items found on White's person. The evidence found in the plastic bag in the motel

11

room thus had marginal "importance . . . in the prosecutor's case." *Angel v. Commonwealth*, 281 Va. 248, 264, 704 S.E.2d 386, 396 (2011). The challenged evidence also had little bearing on White's defense. He presented no evidence at trial. White did not call Tanya to the witness stand. *See Robinson v. Commonwealth*, 165 Va. 876, 880, 183 S.E. 254, 256 (1936); *Pollino v. Commonwealth*, 42 Va. App. 243, 251, 590 S.E.2d 621, 625 (2004). Nor did he identify anything in the Commonwealth's case-in-chief that specifically contradicted the evidence recovered from the plastic bag in Tanya's motel room. *See Angel*, 281 Va. at 264, 704 S.E.2d at 396.

The incriminating evidence found during the personal search of White was both overwhelming and uncontested. At oral argument on appeal, White's counsel conceded that there is "nothing in the record" to provide an innocent explanation for the incriminating evidence found during the personal search of White. Oral Argument Audio at 19:09 to 19:40. This evidence included:

- a large amount of uncut "raw" heroin in three baggies of different weights, J.A. at 130-32, consistent with a drug dealer's typical inventory;

- enough heroin, after cutting, to produce as many as 129 capsules of heroin when most heroin users, the expert opined, possess no more than 2 to 4 capsules at any one time, *id.* at 145;

- the *absence* of any smoking devices, capsules, syringes, or other user "work kit[s]" that would allow White to use any of the raw heroin in his possession, *id.* at 138-39;

- multiple stacks of currency sorted into different denominations and separated into different pockets, which the expert explained is a practice of drug dealers who are fastidious with their revenues, *id.* at 131; and

- two cell phones, which indicates distribution because, as the expert testified, dealers typically use one cell phone as a "drug work phone" and the other as a "personal phone," *id.*; *see also id.* at 139.

All of this evidence was found on White in the parking lot of a "known drug motel," *id.* at 70, that drug dealers had boasted about as being "their area of choice as far as meeting and making these [drug] transactions," *id.* at 58.

Based solely upon this unchallenged evidence, we find "beyond a reasonable doubt that a rational [factfinder] *would have* found the defendant guilty absent the error." *Neder*, 527 U.S. at 18. To be sure, our collective experience persuades us that it is wholly implausible that any reasonable factfinder would have concluded that, under the circumstances of this case, White had possessed such a large amount of uncut, raw heroin only for his personal use.

III.

In sum, the best and narrowest ground for deciding this case is our conclusion that the error White claims that the trial court committed was harmless as a matter of law. We thus reverse the contrary holding of the Court of Appeals and, consequently, vacate as moot the remaining portion of the opinion addressing the trial court's denial of White's motion to suppress.[6] We reinstate White's conviction for possession of heroin with the intent to distribute, third or subsequent offense.

*Reversed in part,*
*vacated in part,*
*and final judgment.*

---

[6] *See Commonwealth v. Harley*, 256 Va. 216, 219, 504 S.E.2d 852, 853 (1998) (holding that the question whether a trial court erred is "rendered moot" by any "further ruling that the error . . . was harmless").