# Richmond.

ROY OLIVER v. COMMONWEALTH OF VIRGINIA.

November 15, 1928.

Absent, Chichester, J.

The opinion states the case.

*Chas. A. Hammer* and *C. E. Gentry*, for the plaintiff in error.

*John R. Saunders, Attorney-General, Leon M. Bazile* and *Edwin H. Gibson, Assistant Attorneys-General,* for the Commonwealth.

HOLT, J., delivered the opinion of the court.

Roy Oliver, who was twenty-one years old, shot and killed Albin Haney, a boy of fifteen years, at Ruckersville, in Greene county, on Saturday, September 3, 1927, at six o'clock p. m. For the Commonwealth it is said that this was a deliberate murder, and for the accused it is said that it was an accident pure and simple. This issue was submitted to a jury, which found him guilty of murder in the second degree and ascertained and fixed his punishment at confinement in the penitentiary for a term of eighteen years. The verdict was confirmed by the trial court, and to it a writ or error has been awarded.

In the early afternoon of that day, the accused, his father and brother, Charles, went in an automobile from their home to Stanardsville. They lingered in that village for some time. Charles there left them to visit an uncle while Roy Oliver and his father came on to Ruckersville where they remained for an hour or more. Roy then took his father home and came immediately back. It was on his return that the shooting occurred.

There were a number of eyewitnesses.

Frank Daniel, then nine years old, testified on behalf of the Commonwealth. Although quite young, his evidence seems to be frank and straightforward, and was unshaken on cross-examination. He, in substance, stated that on the afternoon of the homicide he saw the accused chase the deceased with a rock in his hand, extended as if to strike. On this occasion he called to Haney to stop. This Haney did, and Oliver then took something from him which the record shows was a letter. Afterwards, upon his return from home and while still in the car, he said to Haney: "Come here." In response to this request Haney started towards him and when about two or three feet away was shot in the head and fell to the ground. At the time of the shooting Haney had not reached the car and had not touched it, nor had he touched the pistol. Oliver "pulled it (the pistol) out of the case real quick and shot him." Nothing was then said except: "Come here," and neither of the parties were smiling.

A. T. Dulaney, Jr., testified that when Oliver called to Haney to come to him, Haney was about ten feet away and when shot he was about two feet distant; that he never had his foot on the running board, and did not touch the pistol. This is his statement, in part, of what occurred:

"Q. I believe you described how he got the pistol. How was that done?

"A. He pulled it out of the case real quick and shot him."

And on cross-examination he said:

"Q. Now then, what did Oliver do when he shot?

"A. He pulled it out real quick and shot and then put it back."

The pistol had been in a case, and he said: "I saw him pull the case up, and when he took it out he put the case back."

When asked if Oliver said anything at that time, he answered: "No, sir. He said he didn't know there was anything in the pistol."

Albert Dulaney also heard Oliver say to Haney: "Come here." His evidence is that Haney, in compliance with this request, advanced towards the car in which Oliver sat and stopped when about two and a half feet away. Oliver then "just pulled it (the pistol) and shot him." Haney did not touch the pistol and did not touch the car.

Such in substance is the Commonwealth's case.

For the defendant it is claimed that this man and boy were on the friendlies; terms: had been playing together just before Oliver took his father home, and that the shooting was wholly unintentional. A witness, Johnson, testified that as Oliver got out of the car "he said 'I didn't know it had a bullet in it,' and he said he was projecting with his gun, and said he didn't know he had a bullet in it."

Douglas, another witness, heard Oliver say that it was an accident, while Lindsay states that at the time of the shooting Oliver was talking and laughing.

This is Oliver's account of how the tragedy came to pass:

"Q. On which side of the road in Ruckersville did you stop the car to put that darky out?

"A. On the right where they get gas, and then pulled over to the left to park.

"Q. And then what happened?

"A. I slid over and got out.

"Q. To which side of the car were you sliding to get out?

"A. On the right hand side.

"Q. On which side is the steering wheel located?

"A. On the left-hand side.

"Q. And you were sliding over towards Dulaney's store?

"A. Yes, sir.

"Q. Then what happened?

"A. I took the switch key out,. and Albin walked up to the car, laughing, and I was laughing too. And he asked me where I was going, and I told him I was going over to Miss Cason's.

"Q. How close to the car was Albin when he saw the gun?

"A. He had his hand leaning over in the car through the window.

"Q. Where were his feet?

"A. One foot was on the fender so far as I can remember.

"Q. Then what happened?

"A. He pulled for the gun and I pulled and the thing went off accidently.

"Q. How; had you said anything, was anything said, or did anything happen, there between you, or were you mad, or anything like that?

"A. No, sir.

"Q. I wish you would show me; take hold of that man (indicating) just like Albin had it (it isn't loaded), and I want you to show he had it?

"A. The gun was sticking in the car, just like that (indicating) and Albin took hold of it right around the barrel and I caught hold of it just like that (indicating), and it went off."

He also said:

"Well; then Albin fell, and it shocked me nearly to death right at the time; and I sat there, I don't know

how long; it might have been a minute and it might not have been a minute. I got out of the car and went toward Albin Haney; and Albin raised his head and said: 'Roy, take me somewhere.' And I picked him up in my arms."

He also stated that the pistol was not his but belonged to his brother Charles, and that it was put by that brother in the car at Stanardsville to be taken back home, and was left there by mere oversight.

He did take Haney to a physician and afterwards to a hospital at Charlottesville, and bound himself to pay personally such hospital charges as might be incurred.

■ This evidence is in hopeless conflict, and it must be conceded that the absence of satisfactory proof of motive, or of malice, tends to support the claim that the killing was purely accidental. A jury, however, saw the witnesses and heard them testify, and its finding has been approved by the fair-minded judge who presided at the trial. The jury, well within the discretion vested in it, has seen fit to believe the evidence tendered on behalf of the Commonwealth, and to disbelieve all in material conflict therewith offered for the accused. With this lawful exercise of vested power the court, upon well settled principles, has no right to interfere.

It is next said that the trial court erred in giving this instruction: "The court instructs the jury that manslaughter is when a person feloniously, unlawfully, but without malice, kills another. Manslaughter is divided into two classes—voluntary and involuntary. Voluntary manslaughter is the unlawful killing of another without malice, in a sudden quarrel or in heat of blood, on a sufficient provocation. *Such killing may amount to murder in the second degree.*"

That instruction, as originally tendered, read: "The court instructs the jury that manslaughter is where a person feloniously, unlawfully, but without malice, kills another. Manslaughter is divided into two classes—voluntary and involuntary. Voluntary manslaughter is the unlawful killing of another without malice, in a sudden quarrel, or in heat of blood, in a sufficient provocation. *But if such killing was done in heat of passion or on a slight or insufficient provocation* such killing may amount to murder in the second degree."

In the petition for a writ of error, this statement is made: "Objection was made by counsel for petitioner to the *whole of the last sentence*, and the court sustained the objection, running a pencil mark through the italicized words, and erroneously and unintentionally left the words, 'such killing may amount to murder in the second degree,' untouched, and handed the instructions to the stenographer to be copied. They were copied and returned to the court and read to the jury in form in which this instruction (No. 4) now appears. In the rush of the work next morning the presence of this highly objectionable and prejudicial concluding sentence was not observed, it was, of course, assumed by counsel, as it was intended by the court, that this instruction would be given with the whole of the last sentence stricken out, as the court had sustained our objection to it.

"The error was not discovered until after the case was ended, when, on December 7, 1927, the bills of exception were presented and being signed, in accordance with the final order in the case, whereupon a written motion was made, setting forth this additional ground, to set aside the verdict and grant a new trial, but this motion was overruled and petitioner duly excepted."

■ No objection of any kind was made to this instruction when given in its amended form. Final judgment was entered on October 21, 1927, and not until December 7, 1927, after court had adjourned for the term, was any objection made to it at all. It came too late. *Allen* v. *Commonwealth*, 114 Va. 826, 77 S. E. 66; *Thaniel* v. *Commonwealth*, 132 Va. 813, 111 S. E. 259; *Jordan* v. *Commonwealth*, 135 Va. 560, 115 S. E. 569.

■ Reduced to simple form, it told the jury that voluntary manslaughter might be murder—an error in certain circumstances of the gravest moment. In the case in judgment, the killing was either accidental or deliberate. There is no evidence to support any other conclusion. The court told the jury that the accused was not guilty if the killing was accidental. The jury did not return a verdict of not guilty. To hold that the error was hurtful, we would have to assume that they returned a verdict unsupported by evidence and contrary to the court's instructions. It was no more relevant to the evidence, and in all human probability had no more influence on the verdict, than would an instruction addressed to the law of ejectment. If Oliver was guilty at all, he was guilty of murder.

That no confusion was created by this error and no misunderstanding as to the clear cut issue presented, is made manifest by the fact that it was discovered by no one until long after the trial.

■ It has been well said that there is no such thing as a perfect trial. Every man is entitled to a fair trial and to nothing more, and so out of the necessities of the case, and out of the imperative demands of common sense, has grown the doctrine of harmless error.

There is no reversible error in this assignment.

■ Complaint is made of this instruction: "On the charge of murder, if the fact of the killing has been

established, and is unaccompanied with circumstances of palliation, the burden of disproving malice is thrown on the accused."

Its soundness as a proposition of general law is conceded, but it is insisted that it applies only when the killing is intentional, and has no application to the case at bar, in that the evidence shows here an accident only.

Unquestionably, the defendant's evidence does tend to show this, and if that evidence was all the evidence, this instruction would be wrong; but it is also true that the Commonwealth is entitled to instructions based upon its theory of the case supported by its evidence. That evidence tends to show some difficulty between the deceased and the accused shortly before the homicide, and it tends to show that when Oliver returned to Ruckersville he called Haney to him and deliberately shot him as he came. If this was true, the murder was deliberate and the killing was intentional. Such a situation made this instruction entirely proper.

Complaint is made of this instruction: "The court instructs the jury that if they believe from the evidence that the shooting was accidental, there is no presumption of malice from the mere fact of killing, but the burden is upon the Commonwealth to prove beyond a reasonable doubt that the killing was done with malice, 'express or implied.'"

It was tendered on behalf of the accused and was amended over his protest by adding thereto the words, "express or implied." And it is said that it in substance told the jury that they might believe from the evidence that the shooting was accidental, and still find that it was done with implied malice. If there was error here, it was invited, for as originally tendered this instruction told the jury that they might believe

the shooting was accidental and still believe it was done with malice, when the court had in other instructions said that if the shooting was accidental the defendant was not guilty. If he was guilty of malice, and the instruction, as we have seen, in its original form, permitted that to be shown, then it was competent to show it by positive evidence or by facts and circumstances. If the killing was deliberately done, as some of the witnesses for the Commonwealth say it was done, then the law implies malice.

There is no merit in this assignment.

And finally it is said that the court erred in its refusal to give this instruction: "The court instructs the jury that the absence of an inducing cause or motive to commit the crime, when the defense is that it was accidentally done, and the intent with which it was done is in doubt, affords a strong presumption of innocence."

And in giving this over the protest of the defendant: "The court instructs the jury that in order to establish the charge of murder against the accused, it is not necessary for the Commonwealth to prove the motive of such murder."

Taking up these assignments in inverse order, it is manifest that there was no error in the second instance. Proof of motive is never necessary. Its absence is in itself a cogent argument for acquittal, but that is all. *Patterson* v. *Commonwealth*, 193 Va. 589, 123 S. E. 657.

Relative to the first assignment, the refusal of the court to give such an instruction was held to be reversible error in *Vaughan's Case*, 85 Va. 673, 8 S. E. 584. It was refused in *Belote* v. *Commonwealth*, 135 Va. 468, 115 S. E. 520, where the court said: "The court, as a rule, ought not to emphasize evidence tend-

ing to prove particular facts in the case (*N. Y. P. &
N.* v. *Thomas*, 92 Va. 606, 609, 24 S. E. 264), nor to
stress the lack of evidence as to a particular fact.
Whether there was an absence of all evidence of an
inducing cause or motive was a question for the jury."

In *Peoples* v. *Commonwealth*, 147 Va. 692, 137 S. E.
603, it was again refused. Judge Campbell, in com-
menting upon *Vaughan's Case*, said that in it there was
an entire absence of circumstances tending to show any
inducing cause for the homicide, and that "to give
the instruction was, in effect, to tell the jury that
there was no evidence whatever of motive."

To state again the Commonwealth's case, there was
some misunderstanding between Oliver and Haney over
a note from a lady which Haney had in some manner
got hold of. Oliver threatened to strike him with a
rock in an attempt at recovery, and forced him to give
it up. He went home, armed himself with a pistol,
returned, called Haney to him, and shot him without
warning. The motive shown may have been slight,
and it may have been ample. This we can never
fathom. It cannot be said "there was no evidence
whatsoever of motive."

There is no error here, and no reversible error in
the case.

For reasons given, the judgment complained of must
be affirmed, and it is so ordered.

*Affirmed.*