COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Beales, O'Brien and Lorish
Argued at Lexington, Virginia


MATTHEW D. KIDD

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1078-24-3                     JUDGE LISA M. LORISH
                                                        MAY 13, 2025

MOHAMAD BAZAZAN, ET AL.


FROM THE CIRCUIT COURT OF BEDFORD COUNTY
James W. Updike, Jr., Judge

        Jason W. Todd Jr. (Chad A. Mooney; PLDR Law, PC, on briefs), for
        appellant.

        D. Stan Barnhill (Jeffrey B. Hubbard; Woods Rogers Vandeventer
        Black, PLC; Hubbard Law Firm, on brief), for appellees.


        Matthew D. Kidd appeals from the jury verdict and final order of the Circuit Court of

Bedford County, awarding per se and punitive damages to Mohamad Bazazan and Smith

Mountain Lake Airport, LLC (SMLA, or the "Airport") that was owned by Bazazan,[1] on claims

of defamation, and from the trial court's denial of his request for remittitur or a new trial.  For

the reasons that follow, we affirm the trial court's judgment.

---

        * This opinion is not designated for publication.  *See* Code § 17.1-413(A).

        [1] Unless otherwise apparent from the context, we refer to appellees Bazazan and the
Airport collectively as "Bazazan."

BACKGROUND[2]

Bazazan sued Kidd on two counts of defamation—one concerning himself personally, and the other concerning the Airport—alleging that Kidd defamed both in an e-mail to Bedford County Sheriff Mike Miller alleging that "underage girls" were being flown into the Airport for "sex parties." Seeking both compensatory and punitive damages, Bazazan asserted that Kidd made this defamatory allegation "as a result of the ill will he harbored against Bazazan and his Airport business," which Bazazan bolstered by the recitation of other defamatory statements about him that "Kidd ha[d] communicated to public officials and other third parties."

Originally from Iran, Bazazan arrived in the United States in 1975 to study engineering at the University of Louisville, earning bachelor's and master's degrees. He later joined Colgate-Palmolive ("Colgate") where he worked for over 31 years, rising to the position of worldwide director of research and development before he retired. Bazazan eventually developed a passion for aviation, becoming a licensed pilot and operating his own aircraft. He purchased the Airport, in need of significant renovation, with an eye towards his impending retirement from Colgate. Bazazan used his ownership of the Airport as a vehicle for participating in the local community, sponsoring cookouts and other activities on the premises. He developed a reputation in the area as a moral and law-abiding citizen. Among the friends that Bazazan formed in Bedford County was John Frederico, a former acting assistant secretary of the Air Force, who invited Bazazan to his retirement ceremony at the Pentagon, which required a security check for entry.

---

[2] In this "appeal from a judgment of a jury verdict, '[w]e consider the evidence and all reasonable inferences fairly deducible from it in the light most favorable to the prevailing party below.'" *Pegasystems Inc. v. Appian Corp.*, 81 Va. App. 433, 449 n.1 (2024) (alteration in original) (quoting *MCR Fed., LLC v. JB&A, Inc.*, 294 Va. 446, 457 (2017)).

Kidd lived near the Airport, at which he had tie-down rights.[3] Friction developed between Kidd and Bazazan after Bazazan agreed to build a hangar at the Airport to house an aircraft owned by Dan Dunkle, Kidd's former neighbor. Kidd opposed the project, alleging concerns about safety, increased air traffic, and noise. In April 2021, Bazazan learned from Dunkle that Kidd had made allegedly defamatory statements about Bazazan to county officials, and he sought copies of the statements through a Freedom of Information Act (FOIA) request.

Bazazan ultimately learned that after their relationship ended, his former girlfriend, Lucy "LE" Hurlbut, had exchanged communications with Kidd that were hostile to Bazazan. In these communications, Kidd evinced significant ill will toward Bazazan and a desire to harass or otherwise make him suffer. These communications included Kidd's suggestion that he and Hurlbut drive on the Airport's grass to "piss [Bazazan] off," his intention to "unleash hell on [Bazazan]" at a public hearing about the proposed construction of the hangar for Dunkle's aircraft, his desire to "expose" Bazazan for allegedly bribing county officials and poisoning Kidd's dog, and his suggestion that they fell trees across the Airport exit during one of Bazazan's Airport cookouts to impede the egress of guests.

The county's FOIA response revealed that Kidd had launched a letter writing campaign against Bazazan in which Kidd sent complaints to Jordan Mitchell, the county Director of Community Development, bombarding him with complaints about Bazazan almost daily, sometimes even twice a day. These complaints included insinuations that Bazazan was a threat to public safety, that Bazazan was dishonest, that Bazazan had intentionally blocked access to a road that served the Airport and nearby houses, that Bazazan was a reckless person who did not care about the community or his neighbors, that Bazazan engaged in harassment and intimidation, and

---

[3] Tie-down rights allow an aircraft owner to land his plane at the airport, taxi it to a designated area, and secure it—tie it down—to the ground.

that Bazazan constituted a threat to Kidd's "own safety and security" and that of his dog. Kidd also alleged that Bazazan had improperly disposed of a buried fuel tank found on the Airport, that Bazazan had engaged in economic crimes, and that Bazazan had put sugar in the fuel tank of Kidd's vehicle. In another e-mail to the county, Kidd related an incident in which Bazazan had asked Kidd to remove a woodpile that Kidd had allegedly placed on Airport property to serve as a protective barrier between the airport and his propane tank. In this message, Kidd alleged that he had asked Bazazan if he would prefer that Kidd remove the barrier and later have an aircraft veer off the runaway, collide with the propane tank, and cause an explosion. Kidd alleged that Bazazan had responded that "[a]ctually I would like that."

Specifically at issue here, Kidd sent an e-mail to Sheriff Miller repeating and expanding upon allegations, made before via text message to Hurlbut, that "underage girls" were being "fl[own] in" to the Airport "for sex." In this missive, Kidd alleged that during a visit to the Avalon Pier at the North Carolina Outer Banks, he had encountered fellow vacationers from Salem, Virginia. According to Kidd, when informed that he resides at Smith Mountain Lake (SML), a tourist replied "[w]ithout hesitation" that "'[t]hat's where they fly underage girls in for sex parties.'" Kidd further claimed that when asked to confirm that he meant "SML Airport," the tourist replied, "'[y]eah, sick bastards,'" or words to that effect. Kidd explained that all he knew about the tourist was that his name had been "Pat." He stated that his own phone had been dead at the time and that though he had pressed his phone number on "Pat" and urged him to call later, Kidd had heard nothing from him since. Kidd wrote that he knew "how odd that sounds or creepy," but that "given all the things [he] ha[d] shared with . . . other authorities[,] it ma[de] sense." Miller forwarded Kidd's e-mail to another sheriff's department employee with instructions to "look into this." The Federal Bureau of Investigation (FBI) soon appeared to investigate the allegations but closed the investigation shortly thereafter.

At trial, Mark Jordan, a county zoning enforcement officer and former friend of Kidd, testified about other statements Kidd made to him about Bazazan. Kidd alleged to Jordan that the Airport was a training ground for terrorists and that Bazazan was a terrorist, was training terrorists, planned to destroy a dam on Smith Mountain Lake, was flying in underage girls for sex parties, and that Bazazan had killed Kidd's dog.

In his testimony at trial, Bazazan denied or clarified various statements that Kidd had made about him. He denied that he had bribed anyone or ever said he would be glad to see a plane collide with Kidd's propane tank. He also denied killing Kidd's dog. Bazazan denied involvement in any form of terrorist activity or training, and denied Kidd's claim that Bazazan had a plan to blow up the Smith Mountain Lake Dam, noting that his son held a security clearance and that he himself attended his friend's retirement ceremony at the Pentagon, neither of which would be likely if Bazazan were implicated in terrorism-related activity. As to Kidd's allegation about Bazazan blocking a road, Bazazan explained that a tree had fallen across Cutlass Road and that he cut the tree up with a chain saw to reopen it. When the chain on the saw broke, Bazazan explained, he was forced to postpone completing the tree removal until the next day. Finally, Bazazan denied having put sugar in the tank of Kidd's vehicle.

Bazazan described the week after reading Kidd's sex trafficking e-mail as a "week of torture," "stress," and sleepless nights, explaining to the jury that "you cannot imagine being accused of the things that you're totally against" while "trying to do good for the community." Bazazan further testified that the sex trafficking allegation and the resultant FBI investigation had put him "in a fall" that endured long after the initial week of distress and that the allegations adversely affected the reputation of the Airport.

On February 9, 2024, the jury found in favor of Bazazan and the Airport, awarding Bazazan $100,000 in presumed damages and $20,000 in punitive damages, and the Airport $10,000 in

presumed damages and $20,000 in punitive damages.  The trial court set a hearing for entry of the final order.  Three days before that hearing, Kidd filed a "Motion to Set Aside [the] Jury Verdict on Damages and/or Invoke 8.01-383 and 383.1 Remittitur Relief."  In his cover letter accompanying the motion, Kidd conceded that "[t]his Motion c[ould not] be heard" at the upcoming 15-minute hearing for entry of the final order.  "Instead," Kidd explained, he filed the "Motion prior to [the hearing] so the Court will be aware that this Motion is pending," anticipating that the trial court would "determine whether to enter the tendered" order as scheduled, "or delay entry of a final [o]rder pending briefing by the parties and argument."  Bazazan opposed the motion.

The trial court entered its final order on March 21, 2024, implementing the jury's verdict.[4] Kidd appeals.

ANALYSIS

Kidd raises seven assignments of error.  He argues that the trial court erred by (1) admitting testimony about "irrelevant and overly prejudicial statements and conduct allegedly made by" Kidd, (2) refusing a cautionary instruction regarding Bazazan's testimony that Kidd's "statements and conduct . . . outside of October 22, 2020, were part of his 'modus operandi,'" (3) refusing Kidd's proffered jury instruction "regarding the immunity from defamation claims for persons making statements at public hearings," (4) "in finding that the amount of damages had been sufficiently proven as a matter of law" despite evidence purportedly showing that Bazazan and the Airport were not damaged, (5) "in not granting Mr. Kidd's motion to set aside the jury verdict on damages and for remittitur relief" despite evidence showing, in Kidd's view, that the appellants had not suffered damage, (6) "in overruling . . . Kidd's objection" to Bazazan's reading paragraph 5 of the complaint into the record, which in Kidd's view "contained irrelevant and overly prejudicial statements and

---

[4] The trial court entered an amended final order the next day, submitted by the parties "for technical purposes," but that order is identical in all material respects to the original final order.

conduct . . . not relat[ing] to the communication from . . . Kidd to Sheriff Miller" at issue in the case, and (7) "in finding that the evidence was sufficient to prove by clear and convincing evidence that Mr. Kidd made a defamatory statement about, toward, or against the Appellees on October 22, 2020."  As we explain below, we reach the merits of Kidd's first, fourth, fifth, and seventh assignments of error.  We cannot reach the merits of the remainder.  We address those first.

I.  We cannot reach the merits of several of Kidd's assignments of error.

A.  Kidd failed to lodge a timely objection to Bazazan's "modus operandi" testimony.

In his second assignment of error, Kidd argues that "[t]he trial court erred by refusing to give a cautionary instruction to the members of the jury regarding the testimony of . . . Bazazan that statements and conduct of Mr. Kidd," other than the October 22, 2020 message sued upon, "were part of his 'modus operandi.'"  The term "modus operandi" first appears in the trial transcript on the first day of trial.  The context in which it appeared was a colloquy between counsel and the trial court outside the jury's presence, about evidence that Bazazan wished to present to demonstrate a propensity by Kidd to "make up lies" and "create problems for people . . . that he disagrees with or [who] run[] afoul with him," which counsel characterized as "show[ing] the modus operandi of [Kidd]," and as "totally consistent with how he treated" Bazazan.  Kidd objected to this line of argument only on relevance grounds.  After a lengthy discussion, the trial court ruled that evidence not related to the October 22, 2020 e-mail would be admitted only as much as it "relates to malice between" Kidd and Bazazan.

On the second day of trial, asked whether he ever put sugar in the fuel tank of Kidd's vehicle, Bazazan replied that this was "an absurd accusation," but "typical of what Mr. Kidd does. Something happens and he tries to connect it to something else.  In windows, in random things. That is his modus operandi.  I believe you mentioned that yesterday, which means mode of

- 7 -

operation." Kidd made no objection to this statement at the time, though he did object to Bazazan's next statement about an unrelated matter.

Much later, after further testimony by Bazazan and further discussions among counsel and the trial court about unrelated matters, Kidd returned to Bazazan's earlier mention of "modus operandi." Acknowledging that he "did not render an objection" when Bazazan uttered the phrase, he nonetheless asked that the comment "be stricken from the record," before clarifying that he actually wanted "an instruction . . . to the jury" about the remark. The trial court declined to give such an instruction because, in its view, giving an instruction on Bazazan's remark so long after he said it would merely have confused the jury.

It is well-settled that under Rule 5A:18, "[a]n objection must alert the trial judge to 'the particular point being made *in time to do something about it*,'" *Riddick v. Commonwealth*, No. 1663-22-1, slip op. at 5, 2024 Va. App. LEXIS 93, at \*6-7 (Feb. 27, 2024)[5] (emphasis added) (quoting *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019)), and that "[i]f a party fails to timely and specifically object, he waives his argument on appeal," *id.* at 5, 2024 Va. App. LEXIS 93, at \*7 (citing *Arrington v. Commonwealth*, 53 Va. App. 635, 641-42 (2009)). Failing to preserve his objection before the trial court, Kidd has waived his argument for appeal.

> B. We do not have a transcript of the court's decision to reject Kidd's proposed jury instruction, so we cannot reach the merits of assignment of error III.

In his third assignment of error, Kidd faults the trial court for "refusing to give [his] jury instruction 'I' regarding the immunity from defamation claims for persons making statements at public hearings, as codified in [Code] § 8.01-223.2." In its final order, the trial court stated that "after the presentation of the evidence, [Kidd] and [Bazazan] submitted their agreed-upon instructions and the Court heard [Bazazan's] objection to one instruction Defendant sought to be

---

[5] "Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value." *Otey v. Commonwealth*, 61 Va. App. 346, 350 n.3 (2012).

included not agreed to by Plaintiffs.  After hearing argument of counsel, the Court sustained

[Bazazan]'s objection for the reasons stated on the record."  But neither the arguments of counsel

nor the trial court's reasoning for its ruling actually appear in the record before this Court on

appeal.

The partial trial transcripts in the record do not cover important portions of the trial

proceeding, including jury selection, opening and closing argument, appellant's objections to the

verdict, and, critically for this assignment of error, the parties' arguments over jury instructions and

the trial court's rulings thereon.  It is well-established that "on appeal the judgment of the lower

court is presumed to be correct and the burden is on the appellant to present to us a sufficient record

from which we can determine whether the lower court has erred in the respect complained of."

*Justis v. Young*, 202 Va. 631, 632 (1961).  Although the transcripts supplied to this Court record the

testimony of the parties and their witnesses, they omit the portion of the proceedings in which the

trial court considered the arguments of the parties as to Kidd's jury instruction "I."  "Without [that

portion of the] transcript . . . we have no way of knowing precisely the issues raised, waived, or

rejected below" as pertinent to this assignment of error, and "[i]n the absence of a sufficient record,

we will not consider" it.  *Town of Iron Gate v. Simpson*, 82 Va. App. 38, 50 (2024) (citing *Dixon v.

Dixon*, 71 Va. App. 709, 716 (2020)).  Thus, "Rule 5A:8(b)(4)(ii) precludes our review of this

assignment of error because [Kidd] failed to provide an adequate record."  *Id.* at 49.

C.  Any error from reading paragraph 5 of the complaint into the record was harmless.

In his sixth assignment of error, Kidd argues that the trial court "erred in overruling [his]

objection and allowing Mohammad Bazazan to read Paragraph 5 of the Complaint" into the record,

which, in his view, "contained irrelevant and overly prejudicial statements and conduct purportedly

done by [Kidd] that did not relate to the communication from [Kidd] to Sheriff Miller on October

22, 2020."  Assuming without deciding that the trial court erred by allowing the publication of

paragraph 5 to the jury, any such error was harmless because its contents had already been put before the jury repeatedly throughout the trial.

Paragraph 5 became an issue during Bazazan's testimony on the second day of the trial. During cross-examination, Kidd's counsel said to Bazazan that his "complaint for the lawsuit says that one specific allegation, [Kidd's e-mail to the sheriff] on October 22, 2020 . . . was the basis upon which you made this complaint," to which Bazazan agreed. On redirect, Bazazan's counsel asked him to read paragraph 5 into the record. Paragraph 5 recapitulates many of the statements that Kidd reportedly made about Bazazan, including those about Bazazan being involved in terrorism, Bazazan "harassing" Kidd and killing his dog, and other statements. When Kidd objected, Bazazan's counsel replied in effect that Kidd had opened the door, and that he asked Bazazan to read paragraph 5 to rebut "the impression [created] in the jury's mind" that Bazazan had included only the allegation concerning the October 2020 e-mail in the complaint, and that Bazazan had omitted all of Kidd's other alleged bad acts from it. Though skeptical of Bazazan's request, the trial court allowed Bazazan to read it, explaining in some detail how the jury had already heard about all the allegations set forth in paragraph 5.

"Any error that does not implicate the trial court's subject matter jurisdiction is subject to harmless-error analysis because 'Code § 8.01-678 makes "harmless-error review required in all cases."'" *Our Lady of Peace, Inc. v. Morgan*, 297 Va. 832, 853 (2019) (quoting *Commonwealth v. White*, 293 Va. 411, 420 (2017)). "Absent an error of constitutional magnitude, 'no judgment shall be arrested or reversed' when 'it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached.'" *Id.* (quoting Code § 8.01-678). "The harmless-error check on judicial power has never been a begrudged limitation," but is favored in Virginia "because it stems from the 'imperative demands of common sense.'" *Id.* (quoting *Oliver v. Commonwealth*, 151 Va. 533, 541 (1928)).

- 10 -

As the trial court noted, the various allegations of Kidd's bad behavior set forth in paragraph 5 had already been thoroughly ventilated before the jury throughout the preceding testimony, neutralizing any further potential prejudice to Kidd from Bazazan's reading paragraph 5 aloud before them. Therefore, assuming without deciding that it was error to allow Bazazan to read paragraph 5 of the complaint into the record, we find that any such error by the trial court was harmless.

## II. Kidd's remaining assignments of error fail on the merits.

### A. The testimony Kidd objects to was relevant to the issue of malice and not overly prejudicial.

In his first assignment of error, Kidd claims that "[t]he trial court erred by allowing into evidence irrelevant and overly prejudicial statements and conduct allegedly made by the [a]ppellant concerning the [a]ppellees to improperly influence . . . the members of the jury."[6] He maintains that the trial court failed to perform its proper "gatekeeping function"[7] by allowing testimony "unrelated to the specific defamatory statement at issue"—that is, to the sex trafficking allegation that Kidd raised in his October 22, 2020 e-mail to Sheriff Miller. As examples of such "irrelevant and overly prejudicial" evidence, Kidd cites trial references to him suggesting that Bazazan was a terrorist, that he wanted to "unleash hell" on Bazazan, and that he suggested impeding participants from leaving an Airport community cookout by felling a tree. "These statements did not pertain to the specific

---

[6] Kidd also asserts in this assignment of error that the objectionable "statements and conduct" improperly "suggest[ed] to the members of the jury that the alleged defamatory statement" at issue in the complaint "*was about the [a]ppellees*." (Emphasis added). For our view of that contention, *see* our analysis of Kidd's seventh assignment of error.

[7] *See Schaecher v. Bouffault*, 290 Va. 83, 94 (2015) (A trial court must "perform th[e] gatekeeping function" of "decid[ing] as a threshold matter of law whether a statement is reasonably capable of defamatory meaning before allowing the matter to be presented to a finder of fact.")

defamatory statement made on October 22, 2020," Kidd argues, and therefore "their admission misled the jury and confused the issues."

Kidd's argument may have had merit if Bazazan had sought only *compensatory* damages. But Bazazan also sought punitive damages. "To recover punitive damages in a defamation case, the plaintiff must prove actual malice by 'clear and convincing evidence that [the defendant] *either* knew the statements he made were false at the time he made them, or that he made them with a reckless disregard for their truth.'" *Gov't Micro Res., Inc. v. Jackson*, 271 Va. 29, 42 (2006) (alteration in original) (quoting *Ingles v. Dively*, 246 Va. 244, 253 (1993)). Virginia has long considered statements other than those actually sued upon as potentially relevant to the existence of actual malice, deeming "[a]ny other words written or spoken by the defendant of the plaintiff, either before or after those sued on" to be "admissible to show the animus of the defendant . . . whether the words tendered in evidence are themselves actionable or not, or whether they be addressed to the same party or to some one else." *Williams Printing Co. v. Saunders*, 113 Va. 156, 169 (1912). Furthermore, "[s]uch other words need not be connected with or refer to the defamatory matter sued on, provided they in any way tend to show malice in the defendant's mind at the time of publication." *Id.*

Actual malice may be proven in many ways. "[A]ny competent evidence, either direct or circumstantial, can be resorted to . . . including threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, ill will, or hostility between the parties." *Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979) (quoting 50 Am. Jur. 2d, *Libel and Slander* § 455 (1970)). Because the evidence of Kidd's other defamatory statements against Bazazan makes "the existence of" actual malice "more probable," it was relevant to the adjudication of Bazazan's claim for punitive damages. Va. R. Evid. 2:401.

Nor was the evidence unduly prejudicial. "In a sense, all 'evidence tending to prove [liability] is prejudicial'—at least from the point of view of the person" being sued. *Thomas v. Commonwealth*,

- 12 -

44 Va. App. 741, 757 (2005) (quoting *Powell v. Commonwealth*, 267 Va. 107, 141 (2004)). "Virginia law, however, intervenes only when the alleged prejudice tends to inflame irrational emotions or leads to illegitimate inferences." *Id.* at 758. As an appellate court, "[w]e generally defer to trial judges on this subject because they, unlike us, participate first person in the evidentiary process and acquire competencies on the subject that we can rarely duplicate merely by reading briefs and transcripts." *Id.* We will not disturb the trial court's judgment in such matters absent an abuse of discretion. *Id.* at 759. Because the trial court made clear that it admitted such evidence only as long as it "ha[d] a bearing on malice," it did not abuse its discretion in doing so.

B. The evidence was sufficient to sustain the award of damages.

In his fourth assignment of error, Kidd asserts that "[t]he trial court erred in finding that the amount of damages had been sufficiently proven as a matter of law when the [a]ppellees introduced evidence that they had not been harmed or damaged." Kidd argues that "the record . . . does not support that Kidd had malice or reckless disregard for the truth," that "witness testimon[y] supported the notion that the [A]irport and Bazazan did not experience any damages, reputational, financial, or otherwise," and that Bazazan's "own witness testimonies effectively rebutted the presumption of damages."

As to malice, Kidd argues that "[t]he testimonies and facts established during the trial show a lack of direct or circumstantial evidence demonstrating that Kidd acted with malice." But as our discussion of Kidd's first assignment error shows, the record is *replete* with evidence of malice. Having thoroughly examined that issue above, we need not revisit it here.

Kidd also argues that "[t]he lack of direct or circumstantial evidence of financial loss, reputational damage, or long-term emotional distress demonstrated that the alleged defamatory statements did not result in harm." This argument is unpersuasive. The communication at issue

- 13 -

attributes the sex trafficking of minors to the Airport and Bazazan, a potentially criminal act.[8] "[W]ords that impute the commission of a crime which is 'punishable by imprisonment in a state or federal institution' are . . . actionable per se," *Schnupp v. Smith*, 249 Va. 353, 360 (1995) (quoting *Great Coastal Express, Inc. v. Ellington*, 230 Va. 142, 147 (1985)), "and therefore substantial, general damages for injury to both plaintiff's business and personal reputation [are] presumed," *Slaughter v. Valleydale Packers, Inc.*, 198 Va. 339, 348 (1956). "It is difficult, if not impossible, to prove with mathematical precision the quantum of damages for injury to reputation, humiliation, and embarrassment which may flow from a defamation," and therefore "the common law, as early as 1670, modified the usual standard of proof of damages in those cases where the words uttered were actionable per se." *Askew v. Collins*, 283 Va. 482, 486 (2012) (quoting *Great Coastal*, 230 Va. at 148). "At common law, defamatory words which are actionable *per se*" include "[t]hose which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished." *Great Coastal*, 230 Va. at 146. *See also Henry Myers & Co. v. Lewis*, 121 Va. 50, 77 (1917) (the plaintiff "was entitled to recover substantial, and even punitive, damages, without any proof of particular instances of special damage," because "the law presumes general damages where the libel is actionable per se"). For these reasons, Bazazan did not have to prove actual damages to recover.

It is the province of the jury "to assess the damages; they are to determine what injury the plaintiff has sustained, and to what extent the defendant should suffer in his purse for his transgression; and by their view of these two circumstances, they are to assess the damages which the plaintiff ought to recover." *M'Nutt v. Young*, 35 Va. (8 Leigh) 542, 544 (1837). As an appellate court, "[w]e will not set aside a trial court's judgment sustaining" this determination "unless it is plainly wrong or without evidence to support it." *Ferguson Enters., Inc. v. F.H. Furr Plumbing,*

---

[8] *See, e.g.*, the Mann Act, 18 U.S.C. § 2423.

- 14 -

*Heating & Air Conditioning, Inc.*, 297 Va. 539, 548 (2019) (quoting *Parson v. Miller*, 296 Va. 509, 524 (2018)).

Bazazan was not required to prove actual damages to recover. Still, the record shows that Bazazan was damaged by Kidd's defamatory statements. Irrespective of any financial injury, Bazazan testified at trial that "[i]t was disturbing [for] someone [to] come out there and say something that results in an FBI investigation" and that he suffered embarrassment, mental stress, and sleepless nights as a result of Kidd's statements. And Kidd's argument notwithstanding, Bazazan testified that, in his opinion at least, the sex trafficking allegation had a negative effect on the Airport's reputation. But Bazazan need not have proven even damages of this sort to recover. "The cause of action for defamation is based on the transmission of derogatory statements, not on any physical or emotional distress to a plaintiff which may result. 'Defamation is not concerned with the plaintiff's own humiliation, wrath or sorrow.'" *Snead v. Harbaugh*, 241 Va. 524, 528 (1991) (quoting W. Prosser & W. Keeton, *Prosser and Keeton on the Law of Torts* § 111 (W. Keeton 5th ed. 1984)). "The recoverable damages are both general and special. An award of general damages is based on a concept of per se injury, and resulting damage is presumed to exist if the defamation tort is established. No further proof of injury or loss is required for recovery of general damages." *Id.* Finding that Kidd failed to argue that the jury's verdict was plainly wrong and that the verdict was supported by the evidence, we affirm the verdict.

C. The court did not err by denying Kidd's motion for remittitur or to set aside the verdict.

In his fifth assignment of error, Kidd challenges the failure to grant the motion for remittitur on the grounds that both the presumed and punitive damages were excessive. Kidd asserts that "[t]he trial court erred in not granting Mr. Kidd's motion to set aside the jury verdict on damages and for remittitur relief . . . when Appellees introduced evidence that they had not been harmed or

damaged." In both his trial court motion and his opening brief before us, Kidd argues that his defamatory statements about Bazazan caused no financial injury, that the "evidence indicates that the defamatory statements did not harm Bazazan or [the Airport]'s reputation or standing in the community," and that Bazazan did not present evidence that Kidd's statements caused significant emotional harm.

We review a trial court's decision to grant or deny remittitur relief from non-punitive damages for an abuse of discretion. *Poulston v. Rock*, 251 Va. 254, 258-59 (1996). "To justify remittitur [of these damages], a jury's award must be so excessive that it shocks the conscience of the trial court, indicating that the jury's decision was motivated by 'passion, corruption or prejudice.'" *Coalson v. Canchola*, 287 Va. 242, 249 (2014) (quoting *Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 281 Va. 561, 580 (2011)). In contrast, "[i]n evaluating whether punitive damages were properly remitted, [an appellate court] performs a de novo review, examines the record independently and gives 'substantial weight' to the trial court's action." *Id.* (quoting *Baldwin v. McConnell*, 273 Va. 650, 657 (2007)). Relevant to whether to remit punitive damages is the "reasonableness between the damages sustained and the amount of the award and the measurement of punishment required, whether the award will amount to a double recovery, the proportionality between the compensatory and punitive damages, and the ability of the defendant to pay." *Aksoy v. In Stock Today Cabinets, LLC*, No. 0507-23-4, slip op. at 14-15, 2024 Va. App. LEXIS 213, at *21-22 (Apr. 16, 2024) (quoting *Coalson*, 287 Va. at 249).

We start with Bazazan's presumed damages. Bazazan's testimony shows that Kidd's defamation caused him "humiliation[] and embarrassment," "relevant" factors to "be considered in any determination of damages based on defamation *per se*." *Poulston*, 251 Va. at 261. Kidd's argument again "ignores [Bazazan]'s acknowledged right to recover compensatory damages absent any proof of injury or of the quantum of injury." *Id.* "A plaintiff who proves the publication of

- 16 -

words actionable *per se* is simply relieved of the necessity of proving the quantum of his damages for injury to reputation, humiliation, and embarrassment." *Id.* (quoting *Great Coastal*, 230 Va. at 152). "[E]ven in the absence of any evidence of pecuniary loss, the damages which the injured party is entitled to recover may be substantial." *Id.* In sum, Kidd asks us to "do what [w]e may not legally do, that is, substitute [our] judgment for that of the jury." *Smithey v. Sinclair Refin. Co.*, 203 Va. 142, 146 (1961). The jury awarded Bazazan $100,000 in presumed damages and the Airport $10,000 in presumed damages. Given the severity of harm, including mental distress and reputational damage, caused by the defamatory statements, such amounts do not "shock the conscience," and nothing in the record suggests that the jury was motivated by prejudice. The trial court did not err in refusing to remit the jury's award of presumed damages.

We also conclude that the trial court also did not err in refusing to remit the $20,000 that Bazazan and the Airport each received in punitive damages. Given that the punitive damages were only a fraction of the presumed damages for Bazazan and the Airport (when combined), the punitive damages do not amount to a double recovery. Furthermore, punitive damages are appropriate here where Kidd disseminated lies about Bazazan and his business to many members of their community and where those lies were substantially inflammatory. Therefore, the trial court did not err in refusing to remit the jury's award of punitive damages.

D. There was sufficient evidence of a defamatory statement.

In his seventh and final assignment of error, Kidd asserts that "[t]he trial court erred in finding that the evidence was sufficient to prove by clear and convincing evidence that Mr. Kidd made a defamatory statement about, toward, or against the [a]ppellees on October 22, 2020." He argues that "there is a significant lack of clear evidence that Kidd made defamatory statements about Bazazan or SMLA specifically" and that "[t]he October 22, 2020, email refers to the airport, not" specifically "to SMLA or Bazazan." "The plaintiffs attempted to draw connections between

the email and Bazazan by suggesting that the mention of 'airport' and 'Moe' implied defamation of SMLA or Bazazan," Kidd continues, "but no direct reference to them exists in the email in context of sex trafficking." "This lack of direct attribution," in Kidd's view, "undermines the claim that [he] made defamatory statements concerning SMLA or Bazazan."

We disagree. The sole topic of Kidd's October 22, 2020 e-mail was repeating allegations about sex trafficking at the Airport that Kidd had purportedly picked up from a fellow tourist at the Outer Banks in North Carolina. Contrary to Kidd's claim, he explicitly linked these allegations to Bazazan and the Airport in the e-mail. As to the Airport, Kidd wrote to Sheriff Miller that "c[aught] off guard" by the tourist's claim, "[he] asked him[,] SML Airport?" to which the tourist allegedly replied with "something along the lines of 'Yeah, sick bastards.'" Kidd also linked these allegations directly to Bazazan in the e-mail, informing Sheriff Miller that he had "also shared this information with LE, the retired Air Force Colonel who dated Moe" and that "[a]s soon as I told her that she said[,] and I quote '[t]hat explains so many things about Moe. It makes me ill.'" The communication with "LE" that Kidd alluded to was entered into evidence as part of plaintiff's Exhibit One. "LE" is Bazazan's former girlfriend Lucy E. Hurlbut, who testified at the trial. She attested to having dated Bazazan and being the "LE" and retired colonel referred to in Kidd's e-mail to Sheriff Miller; she authenticated the text message exchange referred to in the October 22, 2020 e-mail; and she acknowledged authorship of the quotes that Kidd attributed to her there. Asked by counsel whether she "ever ha[d] any conversations where [Kidd] said anything that would connect Mr. Bazazan with human trafficking," Hurlbut responded that Kidd "had alluded that he had seen young girls at the [A]irport, and that . . . Mr. Bazazan would have had to have known that was going on."

Kidd's argument notwithstanding, the record establishes that the term "Moe" in the October 22, 2020 e-mail refers to Bazazan. Bazazan is referred to as "Moe" approximately 30 times in the

- 18 -

trial transcript, including multiple times by both counsel. There is simply no ambiguity as to the identity of the "Moe" referred to, which is clearly Bazazan.

"In reviewing the sufficiency of the evidence, the Court defers to the jury's findings of fact unless they are plainly wrong or without evidence to support them." *Haba v. Commonwealth*, 73 Va. App. 277, 284 (2021). There is ample evidence in the record that Kidd's October 22, 2020 e-mail to Sheriff Miller defamed both the Airport and Bazazan.

CONCLUSION

For these reasons, the circuit court's judgment is affirmed.

*Affirmed.*